OPINION OF THE COURT
Walter T. Gorman, J.
The defendant in this case, an American Indian, is charged under a New York State indictment with murder and is being prosecuted by its political subdivision, Onondaga County. The alleged crime took place on the Onondaga Indian Reservation, *306 City of Syracuse, New York. The victim was a
sue presented is whether the State of New federal Government has jurisdiction to prosecute .*<5 for the crime of murder allegedly committed upon xiidian reservation lands in New York State. Essentially, this involves an apparent conflict between two Federal statutes; section 1153 of title 18 and section 232 of title 25 of the United States Code. Section 1153 of title 18 of the United States Code originally was enacted in 1885 and, subsequently, has been amended several times. It provides, in pertinent part, as follows: "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.”
On the other hand, section 232 of title 25 of the United States Code was enacted in 1948 and provides that: "The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State as defined by the laws of the State: Provided, That nothing contained in this section shall be construed to deprive any Indian tribe, band, or community, or members thereof, hunting and fishing rights as guaranteed them by agreement, treaty, or custom, nor require them to obtain State fish and game licenses for the exercise of such rights.”
Interestingly enough, while various courts have made reference to one or the other of these statutes during their 95- and 32-year respective histories, no court has ever squarely resolved their effect upon each other.
To begin with, it is uncontroverted that the defendant is an Indian, that the crime was murder and that it took place upon Indian land. (See Oneida Indian Nation v County of Oneida, 414 US 661; People ex rel. Schuyler v Livingstone, 123 Misc 605.) Either of the statutes, standing alone, would seem to *307 apply to the facts of this case and, but for the simultaneous existence of both of them, this jurisdictional controversy would not exist.
Federal statutes are to be construed in view of the established rules for statutory construction. (Bardes v Hawarden Bank, 178 US 524; also, see, 73 Am Jur 2d, Statutes, § 144.) Moreover, one of the primary rules of statutory construction is to ascertain and declare the intent of the Legislature. (United States v Cooper Corp., 312 US 600; Matter of Carr v New York State Bd. of Elections, 40 NY2d 556.) Historical background, underlying circumstances and the legislative notes accompanying the statute are all relevant to its interpretation.
Looking first at section 1153 of title 18 of the United States Code and its historical backdrop, it is clear that both its focus and applicability are nationwide. In New York, the Onondaga Indian Nation, a member of the Six Nations, ceded by treaty control over lands which they occupied within the United States in return for the United States’ protection and guardianship. This treaty was known as the Treaty of Canandaigua of 1794 (7 US Stat 44). The treaty provisions not only acknowledged the lands "reserved” for the Onondaga Nation and the United States’ promise never to claim or disturb the Onondagas in the free use and enjoyment of that land, but also specified the method by which disputes would be resolved between them until the United States Congress provided otherwise. "Lest the firm peace and friendship now established should be interrupted by the misconduct of individuals, the United States and Six Nations agree, that for injuries done by individuals on either side, no private revenge or retaliation shall take place; but, instead thereof, complaint shall be made by the party injured, to the other: By the Six Nations or any of them, to the President of the United States, or the Superintendent by him appointed: and by the Superintendent, or other person appointed by the President, to the principal chiefs of the Six Nations, or of the nation to which the offender belongs: and such prudent measures shall then be pursued as shall be necessary to preserve our peace and friendship unbroken; until the legislature (or great council) of the United States shall make other equitable provision for the purpose.” (Treaty of 1794, art VII, 7 US Stat 44, 46.)
Generally, the land retained by various Indian tribes, under their respective treaties, was land where the Indian people *308 could live in self-governed isolation from the non-Indian world. Indeed, it was recognized at an early stage that the Indians maintained their autonomy with control and jurisdiction over their members within the reservations. However, it was presumed that the Indians did not have criminal jurisdiction over non-Indians absent a congressional statute or treaty provision to that effect. (Oliphant v Suquamish Indian Tribe, 435 US 191, 197.) The "Tribal Courts” were considered only to have jurisdiction over Indians. This was particularly true in cases where one Indian committed a crime against another Indian. In Matter of Crow Dog (109 US 556) the court held that it was within the exclusive jurisdiction of the tribal court to try and punish a defendant Indian for the murder of another Indian.
Shortly after this decision, Congress, in 1885, passed what was then known as the Seven Major Crimes Act (23 US Stat 385). Among its enumerated crimes was the crime of murder. This act is now known as the Thirteen Major Crimes Act or, as previously noted, section 1153 of title 18 of the United States Code. See Youngbear v Brewer (415 F Supp 807) whose facts and conclusions closely parallel those at bar.
The crime of murder is still contained in the act. This act pre-empted the enumerated crimes from tribal jurisdiction as well as State jurisdiction. (Matter of Carmen, 165 F Supp 942.) The United States Supreme Court recently addressed itself to this question of prevailing jurisdiction in United States v John (437 US 634). They stated (p 651) that: "Mississippi appears to concede, Brief for Appellee in No. 77-575, p. 44, that if § 1153 provides a basis for the prosecution of Smith John for the offense charged, the State has no similar jurisdiction. This concession, based on the assumption that § 1153 ordinarily is pre-emptive of state jurisdiction when it applies, seems to us to be correct. It was a necessary premise of at least one of our earlier decisions.” (Seymour v Superintendent, 368 US 351; see, also, Williams v Lee, 358 US 217, 220, and n 5; Rice v Olsen, 324 US 786.)
Furthermore, it has been stated that the enactment of the Major Crimes Act was a carefully limited, pre-emptive intrusion of Federal power into the otherwise exclusive jurisdiction of the Indian tribes to punish Indians for crimes committed on Indian land. (Keeble v United States, 412 US 205, 209.)
With this pre-emptive intrusion, all crimes, other than those enumerated in the Major Crimes Act, committed by one *309 Indian against another within Indian country were subject to the jurisdiction of the tribal courts. (United States v Antelope, 430 US 641, 643, n 2.) However, a non-Indian who committed a crime against a non-Indian within Indian country was subject to prosecution under State law. (United States v McBratney, 104 US 621.)
By enacting section 1153, Congress gave the Federal courts exclusive jurisdiction to try and punish Indians who had committed one of the enumerated crimes. All other crimes were excluded from its sweep (United States v Antelope, 430 US 641, 642, n 1, supra; United States v Quiver, 241 US 602, 606) — even a lesser-included charge. (Kills Crow v United States, 451 F2d 323; United States v Davis, 429 F2d 552.) This does not mean, however, that the defendant would not be entitled to have the Federal court instruct the jury as to a lesser-included charge. (Keeble v United States, 412 US 205, supra; Felicia v United States, 495 F2d 353.) Under the cases and a proper reading of Keeble (supra) it is apparent that the defendant Indian may not be initially charged by information or indictment of the lesser-included charge before a Federal court. Those crimes are left for those sovereignties that have residual criminal jurisdiction. As previously noted, absent a congressional enactment to the contrary, residual jurisdiction falls directly to the tribes themselves. Hence, the tribal courts enjoy generally limited, concurrent criminal jurisdiction with the Federal courts. (Ortiz-Barraza v United States, 512 F2d 1176; United States v Smith, 562 F2d 453; United States v Sosseur, 87 F Supp 225.)
Having delineated the background, intent and scope of section 1153 of title 18 of the United States Code, it is appropriate to turn to the relevance, intent and effect of section 232 of title 25 of the United States Code upon it.
Section 232 of title 25 was enacted by Congress approximately 63 years after section 1153 of title 18. While it specifically applies only to New York State, it is phrased in extremely general terms. At first impression, the statute appears to give the State of New York jurisdiction over all offenses committed by or against Indians regardless of whether or not they occurred within the reservation. There is no question here that the State of New York enjoyed, prior to this enactment, full criminal jurisdiction over Indians for crimes which occurred outside the reservation. "Unfortunately”, a characterization adopted from the United States Attorney’s amicus *310 curiae brief in this matter, section 232 makes absolutely no reference to section 1153 of title 18. This brings the matter squarely within the purview of the rules of construing Federal statutes. Those rules state that when two statutes relating to the same subject appear to conflict, courts should interpret them, if possible, in a manner that would give effect to both. (Baines v City of Damville, Va., 337 F2d 579; Town of Pelham v Village of North Pelham, 38 Misc 2d 234.)
The Legislature is presumed to intend to achieve a consistent body of law. (Stevens v Biddle, 298 F 209.) Accordingly, subsequent legislation is not presumed to effect a repeal of the existing law in the absence of that expressed intent. (Frost v Wenie, 157 US 46; United States v Noce, 268 US 613; General Elec. Credit Corp. v James Talcott, Inc., 271 F Supp 699.) Indeed, the presumption is that subsequent legislation does not work an implied repeal of prior law. (Frost v Wenie, supra; Brown & Bartlett v United States, 330 F2d 692.) Therefore, the legislative intent underlying the statute must be looked at as it is a primary and all-important factor in construing its true meaning. (United States v Rosenblum Truck Lines, 315 US 50.)
The legislative history underlying section 232 is most instructive. The initiative behind this bill arose from a resolution by the New York State Assembly in 1945, which was specifically addressed to the President of the United States Senate and the Speaker of the United States House of Representatives. The New York legislators asserted three pertinent points in requesting Congress to give it jurisdiction over the Indians — with limitations. First, they stated that neither the Federal Government nor the Indian residents in reservations within New York State had forumlated an "adequate” system of laws for the government, protection and regulation of reservations and Indians thereon. Secondly, they alluded to recent Federal court challenges to the right of the State of New York to exercise jurisdiction over Indians anywhere in the State. (See United States v Forness, 37 F Supp 337, revd on other grounds 125 F2d 928, cert den sub nom. City of Salamanca v United States, 316 US 694.) Thirdly, the New York Legislature requested the following: "Resolved (if the Senate concur), That the Congress of the United States be, and it hereby is respectfully memorialized and urgently requested to enact legislation declaring the Indians within the State of New York, whether residing within or without any of *311 the reservations within such State, subject to the jurisdiction and laws of the State of New York in all respects excepting only those matters wherein jurisdiction has been or hereafter shall be expressly assumed by the Federal Government.” (US Code Cong & Admin News, 1948, vol 2, p 2285; emphasis added.)
The upshot of this resolution is clear. New York State wanted to insure that it did have jurisdiction over Indians within the State, subject only to those matters expressly reserved to the Federal Government. Undoubtedly, section 1153 of title 18 of the United States Code was just such an expression.
In addition, both committees in the United States Congress that studied section 232 prior to its enactment concluded that the legislation was needed because in certain instances "Indian Tribes” were not enforcing the law covering offenses committed by Indians. As noted before, Indians had residual jurisdiction over crimes under section 1153 of title 18 of the United States Code. The overriding need to correct the ineptitude of the Indian courts was further pointed out in letters that were made a part of the congressional committee report on this matter. The first letter was from the United States Attorney in Buffalo, New York. (See US Code Cong & Admin News, 1948, vol 2, pp 2285-2286.) The United States Attorney stated that while in theory "petty offenses”, such as disorderly conduct, were within the jurisdiction of the . Indian courts, no provisions existed for punishment in those courts. He further complained that nothing was being done about these petty offenses and requested that if the United States did not wish to do anything about it, then it should allow the State of New York the privilege to do so. The second letter was from the Under Secretary of the Interior who stated: "None of the Indian groups in the State [New York] have courts which now handle crimes not subject to Federal jurisdiction * * * I am sure they [Indians] would be benefited by the imposition of State criminal laws which would not conñict with Federal jurisdiction.” (US Code Cong & Admin News, 1948, vol 2, p 2287; emphasis added.)
The clear indication from all of this is that Congress intended to give New York criminal jurisdiction in areas not expressly claimed by the Federal Government. They gave New York jurisdiction that had been previously harbored in the hands of the Indian tribes on the Indian reservations. The *312 question as to whether section 232 granted New York exclusive or concurrent criminal jurisdiction in matters not claimed by Federal jurisdiction is not to be answered here. Any jurisdictional conflict between New York State courts and the Indian tribal courts is outside the scope of this case.
There are other reasons for this court to declare that section 1153 of title 18 of the United States Code is in full force and effect in New York State.
If Congress intended that section 232 of title 25 of the United States Code abrogate the application of section 1153 of title 18 of the United States Code, they could have stated it in 1948. In addition, in 1953, five years after Congress enacted section 232 of title 25 of the United States Code, they adopted title 18 (§ 1162, subd [c]) of the United States Code which specifically withdrew the application of section 1153 of title 18 of the United States Code from certain States. New York State was not among them. Congress then had two clear opportunities to act in accordance with the jurisdictional position the State of New York now asks this court to adopt. There is a telling distinction between defining the scope of statutory language and, adding to that language, provisions that the Legislature itself has had ample opportunity to include, but failed to do so. The uphill battle to overcome the presumption against implied repeal of a statute is not eased by a legislative history that overwhelmingly supports an opposite conclusion. Nevertheless, a court would be far more justified in finding an implied repeal under such circumstances than it would be in making law in an area cultivated, but unharvested by the Legislature. The separation of powers was not an accident.
Furthermore, certain cases and points raised by the Onondaga County District Attorney’s office and the United States Attorney’s office merit some treatment here. Both offices cite Oneida Indian Nation v County of Oneida (414 US 661, 679, supra) which stated: "We are also aware that New York and federal authorities eventually reached partial agreement in 1948 when criminal jurisdiction over New York Indian reservations was ceded to the State.”
First and most importantly, this entire section of that decision is pure dicta. Secondly, this was a civil case where no mention at all was made of section 1153 of title 18 of the United States Code. A "plain meaning” argument can be *313 raised for any statute like section 232 of title 25 of the United States Code; however, it cannot be used when statutes in pari materia conflict on their face. In other words, dicta regarding the apparent plain meaning of a statute can have no bearing upon a determination that resolves an obvious ambiguity between that statute and one on the same subject matter. Also cited for the court’s review is Washington v Yakima Indian Nation (439 US 463, 471, n 8). That case cited section 232 of title 25 of the United States Code as a "surrender of authority” and suffers from the same problems underlying Oneida Indian Nation (supra). Nevertheless, it should be noted that this decision does not deny that section 232 of title 25 of the United States Code is a surrender of authority, only that the surrender is not complete (see US Code, tit 18, § 1153).
Lastly, the United States Attorney has brought to the court’s attention the fact that the Secretary of the Interior specifically suggested to Congress that language should be included within section 232 of title 25 of the United States Code to indicate that nothing in the act would deprive the United States’ courts of jurisdiction over offenses by or against Indians. The secretary further stated that language similar to this has been used in other statutes for States such as Kansas. The United States Attorney infers that because this langauage was not made a part of section 232 of title 25 of the United States Code, Congress intended a transfer of total and exclusive criminal jurisdiction to New York State. This inference cannot be made in light of the written tangible history that was recorded at the time this act was passed. The committees in both houses of Congress stated clearly that section 232 of title 25 of the United States Code established "no precedent” and that it provided jurisdiction similar to that given other States, specifically, Kansas. Bearing this in mind, no inference can be drawn from Congress’ failure to include an acknowledgment of some Federal jurisdiction.
Section 1153 of title 18 is in effect in New York State and retains for the Federal Government exclusive jurisdiction over the crimes of murder and others specified therein. The State of New York’s criminal jurisdiction over Indians is limited only by section 1153 of title 18 of the United States Code. This includes jurisdiction over lands within the acknowledged Indian reservations in the State.