OPINION OF THE COURT
Jan H. Plumadore, J.
These defendants have moved this court for the following relief: dismissal of all charges because (1) the courts of the State of New York lack jurisdiction over (Mohawk) Indians, (2) the charges are the result of “selective and persecutorial prosecution”, and (3) in the interests of justice; dismissal of such of the charges as are not supported by sufficient evidence ;• inspection of the Grand Jury minutes; bill of particulars; multifaceted discovery.
I. JURISDICTION
A. STATUS OF INDIAN TRIBES
Indian tribes, contrary to the defendants’ assertions, are no longer sovereign bodies or nations, that is, they are “no longer ‘possessed of the full attributes of sovereignty’ ” *523 (United States v Wheeler, 435 US 313, 323, citing United States v Kagama, 118 US 375, 381), no longer capable of entering into “direct commercial or governmental relations with foreign nations” (United States v Wheeler, supra, p 326, citing Worcester v Georgia, 6 Pet [US] 515, 559). “Their incorporation within the territory of the United States, and their acceptance of its protection, necessarily divested them of some aspects of the sovereignty which they had previously exercised. By specific treaty provision they yielded up other sovereign powers; by statute, in the exercise of its plenary control, Congress has removed still others” (United States v Wheeler, supra, p 323). In 1857 the New York Court of Appeals very aptly termed the status of Indian nations/tribes “quasi independent” (People ex rel. Cutler v Dibble, 16 NY 203, 212, affd 62 US 366; see, also, St. Regis Tribe of Mohawk Indians v State of New York, 5 NY2d 24, 38, cert den 359 US 910, reh den 359 US 1015). Finally, and more germane to the cases at bar, while “ [i] t is undisputed that Indian tribes have power to enforce their criminal laws against tribe members” (United States v Wheeler, 435 US 313, 322, supra; emphasis supplied) they cannot try nonmembers in tribal courts (Oliphant v Suquamish Indian Tribe, 435 US 191). This power is of course subject to complete defeasance by Congress in the exercise of its plenary power. It is of course the customs and practices of the tribe which determine tribal membership or lack thereof (Matter of Patterson v Council of Seneca Nation, 245 NY 433).
B. VALIDITY OF SECTION 232 OF TITLE 25 OF THE UNITED STATES CODE
As noted in the Wheeler case, Congress possesses plenary power over Indian tribes by virtue of their dependent status. Included within this plenary power is the exercise of Federal criminal jurisdiction over Indians. In the cases of certain groups of States, Congress delegated, or in some cases proffered, this power to them in 1953 (see Pub L 83-280 [67 Stat 588]; Washington v Yakima Indian Nation, 439 US 463). In the State of New York’s case, however, Federal criminal jurisdiction was specifically ceded to it
*524 (New York) (Washington v Yakima Indian Nation, supra, pp 471-472) in 1948 via section 232. While section 232 has never been tested in the United States Supreme Court, the cases that do mention it discuss it favorably (Washington v Yakima Indian Nation, supra; Oneida Indian Nation v County of Oneida, 414 US 661). This court shares the Supreme Court’s implicit opinion that section 232, like Public Law 83-280, is a valid delegation of Congressional (Federal) power.
The defense argues, however, that section 232 is invalid because (1) Congress did not specifically say it intended, via section 232, to abrogate any treaty (les) and, in the alternative, (2) unilaterally abrogating treaty rights violates international law. As to (1), the Supreme Court addressed this point in Washington v Yakima Indian Nation (supra, p 478, n 22) when it said: “the argument made by the Tribe is tendentious. The treaty right asserted by the Tribe is jurisdictional. So also is the entire subject-matter of Pub. L. 280. To accept the Tribes’s position would be to hold that Congress could not pass a jurisdictional law of general applicability to Indian country unless in so doing it itemized all potentially conflicting treaty rights that it wished to affect. This we decline to do. The intent to abrogate inconsistent treaty rights is clear enough from the express terms of Pub. L. 280.” If what was said in regard to Public Law 83-280 is true, then it must also be true in the case at bar where there are at least two major treaties (1794 and 1796) in issue (disregarding, for our purposes, all the other treaties dealing with Indians residing in New York State). With regard to (2) above, despite the fact that Indian treaties have been referred to as recently as 1979 as “essentially a contract between two sovereign nations” (Washington v Fishing Vessel Assn., 443 US 658, 675, citing Lone Wolf v Hitchcock, 187 US 553), by virtue of their special, dependent status Congress has plenary power over Indian tribes (Washington v Yakima Indian Nation, 439 US 463, 500-501, supra; United States v Wheeler, 435 US 313, supra). Stated simply, from Worcester v Georgia (6 Pet [US] 515, supra) in continuous succession to Washington v Yakima Indian Nation (supra) *525 the Indian law of this Nation has been shaped and determined by the dependent, quasi-sovereign status of the Indians and not by any application of conventional principles of international law.
The prosecution contends that section 232 of title 25 of the United States Code amounts to a complete defeasance by Congress of any remaining jurisdiction by the tribe. This court cannot subscribe to that view.
At the time of the enactment of section 232 or at any time before Congress had not shown any intent to completely divest the St. Regis Indians of their remaining jurisdiction. All Congress sought to do by the enactment of the statute in question was to convey whatever jurisdiction the Federal Government possessed to New York State (S Rep No. 1489, 80th Cong, 2d Sess [1948]).
In addition a strong presumption exists that in civil or criminal disputes between tribal members on reservation land the tribe possesses jurisdiction coequal with that of the United States. This is retained jurisdiction by the tribe as a result of its unique quasi-sovereign status (United States v Wheeler, 435 US 313, supra; Oliphant v Suquamish Indian Tribe, 435 US 191, supra).
Section 232 of title 25 of the United States Code simply transfers the Federal portion of jurisdiction in all such matters to New York State.
It is the conclusion of this court that section 232 of title 25 of the United States Code was and is a valid surrender of Federal criminal jurisdiction over Indians within the borders of New York State.
C. APPLICABILITY OF THE TREATIES OF 1794 V 1796
The defense argues that the Canandaigua Treaty of 1794 (52 Parry, Consolidated Treaty Series, p 237) between the Six Nations and the United States is the treaty determinative of their rights (and indeed the rights of all Indians on the St. Regis Reservation). The courts of this State, however, and the United States Supreme Court by implication, take the opposite view; that is, that the Treaty of 1796 (53 Parry, Consolidated Treaty Series, p 109), *526 between the Seven Nations of Canada and the United States is the applicable treaty (St. Regis Tribe of Mohawk Indians v State of New York, 5 NY2d 24, supra; Matter of Fischer v Tebo, 9 AD2d 470). In Matter of Fischer v Tebo (supra, pp 471-473) the Appellate Division said: “Tebo appeared specially to contest the jurisdiction of the court, contending that the St. Regis Tribe was governed by the Treaty of 1794 which granted to the people of the Six Nations the sole right to govern themselves without interference by the courts, also that the court could not settle jurisdictional disputes as to property within the reservation and that the elective chiefs who filed the complaint did not lawfully represent the American branch of the tribe. The court overruled these objections, determining that the Treaty of 1796 - not 1794 - was applicable to the American branch of the St. Regis Indians; that section 106 of the Indian Law did not preclude the court from finding Tebo an intruder and that the Legislature of the State of New York provided the manner and method for the election of chiefs and there was no evidence before the court of noncompliance with the law - section 110 of the Indian Law. Section 106, mentioned herein, governs jurisdiction of Council of Chiefs to determine disputes.
■ “In a subsequent opinion, dated January 15, 1958, the County Court determined the merits of the controversy, holding that Tebo was a member of the Canadian branch and as a consequence he was an intruder subject to removal and so ordered. The court made no finding concerning the real property rights.
“From a reading of the two treaties involved, set forth in the record, it conclusively appears that the Treaty of 1796 was intended to govern the St. Regis Indians. Not only does it refer to the tribe by name but provides, among others, for the tract of land now known as the St. Regis Reservation in Franklin County. The Treaty further provided for the State of New York to compensate the seven Canadian tribes and they relinquished all their rights to lands within the State. In recent years there has been considerable litigation as to Indian property - perhaps due to its close proximity to power and water developments - *527 and that the St. Regis Indians were part of the Seven Nations Treaty made in 1796 seems to be authoritatively settled. (St. Regis Tribe v State of New York, 5 NY2d 24, 29, 32, 37, 40, cert, denied 359 U.S. 910, rehearing denied 359 U.S. 1015.) We determine in this action that such treaty governs.
* * *
“In further reliance upon the Treaty of 1794, appellants argue that sections 108-113 of the Indian Law are unconstitutional. These sections involve the procedure and election of officers - chiefs - of the tribe of St. Regis Indians in New York State. Having already determined that the Treaty of 1794 does not govern the St. Regis Tribe, there is no merit to the argument and no necessity for further discussion.”
It is therefore the settled law of this State, and indeed implicitly of this Nation, that the Treaty of 1796 is the one which, in conjunction with both Federal and State law, governs the rights, especially jurisdictional and governmental, of the Indians on the St. Regis Reservation.
This conclusion regarding the Treaty of 1796 is amply supported by historical evidence dealing with both colonial era Indian demographics and treaty negotiations. Much of the source material for these historical findings was provided or cited by the defense.
Northern New York State and southern Canada during the 1600-1700’s were somewhat in dispute as to which tribes of Indians had “proprietary” rights therein. Two of the maps submitted/reviewed show the Mohawks themselves mainly confined to the area around the Mohawk River.[1] The second of these maps, as well as one other,[2] lists northern New York and southern Canada as either the country of the Six Nations or their deer-hunting territory, with the latter map listing northern Vermont as Iroquois *528 beaver-hunting country. Two other maps[3] merely list the northern boundary of the Iroquois as open.
Prior to and during the early colonial period:
“Surrounding the few tribes of the Iroquois on every hand dwelt the much more numerous tribes of the Algonquin family, to which belonged all the New England tribes, as well as the Mohicans, Horicans, and other New York Indians who dwelt east of the Hudson and were known as River Indians.
“Northward of the Iroquois were the Nipissings, La-Petite Nation, and LaNation De LTsle, and other tribes in the valley of the Ottawa River. Along the valley of the St. Lawrence dwelt the Algonquins proper, the Abenaquis, the Montagnais, and other roving bands below the mouth of the Saguenay.”3 [4]
The Iroquois were nearing the height of their power in the 16th and 17th centuries, however, and they succeeded in relegating most of these neighbors to the status of secondary powers. During the middle of the 17th century alone the Iroquois destroyed the Tobacco and Neutral nations of what is now southeastern Ontario, defeated the Eries and drove the Mohicans of what is now Rensselaer County beyond the Connecticut River, laying claim to Vermont as beaver-trapping territory.
Notable exceptions to total Iroquois domination were the Algonquins and the Hurons. The latter restricted Iroquois expansion in the Great Lakes area and the former hotly contested any Iroquois movement into the northern Adirondack Mountains and the St. Lawrence Valley.[5]
The Indians of Akwesasne (the St. Regis Reservation) arrived at that location via Caughnawaga (near Montreal).[6] The latter reservation was settled by Mohawks (circa 1669), Hurons, Abenakis and many others who had been converted to Christianity by Jesuit missionaries dur *529 ing the 17th century.[7] Around 1755 the Akwesasne settlement was established by a group from Caughnawaga, in part to alleviate overcrowding there.[8] The settlement at St. Regis was included in the Seven Nations of Canada, a “loose religious confederation formed sometime during the 18th century”,[9] being included therein to “take the place of the scattered tribe” (the Oswegatchies), “and they thenceforth represented them in the assemblies.”[10]
Relations between the Iroquois and the Caughnawagas (Seven Nations) were never especially cordial: The Iroquois renounced the Caughnawagas in 1684 because they refused to return to the Mohawk Valley;* [11] the Caughnawagas, under the auspices of the French, attacked the Senecas twice, the last time in 1687 ;[12] the Iroquois once attacked Caughnawagas, which served to solidify the French-Caughnawaga alliance for 70 years thereafter;[13] the Mohawks and Caughnawagas met in 1799, unsuccessfully, to attempt to resolve differences regarding land claims in northern New York;[14] the Caughnawagas and Iroquois, circa 1757, were at odds over whom to support, the French or the British.[15]
During the time of. the American Revolution those residents of Akwesasne/St. Regis who were descended from the Iroquois (generally Mohawk) were separated by religion,[16] form of government (elected v traditional, *530 which Canadian/U.S. St. Regis split was principally occasioned by annuity disputes and finally by the War of 1812),[17] national allegiance, 100 or more years of history, and 200 miles from their “ancestors” and central New York. This separation has in large part continued until the present day, with two exceptions.
In 1888, the Six Nations (Iroquois) adopted the St. Regis Indians to succeed the Mohawks as the “keepers of the eastern door”, the Mohawks having lost that status when they moved to Ontario. As a result, the traditional nine Mohawk chiefs’ titles were given over to the St. Regis Indians.[18] Also, the Longhouse form of religion arrived at St. Regis in the 1930’s (see n 16). Despite these two exceptions, the Indians at St. Regis are legally just that, St. Regis Indians despite the fact that most are ethnically Mohawks. Whatever their revived cultural identity may be, it changes their legal status no more than that of the average United States citizen who traces his/her ancestry back to England, Poland, Germany, Ireland, China, Africa or wherever. The only difference is that, because they are a recognized tribe, they retain some vestiges of the sovereignty they initially enjoyed as one of the Seven Nations of Canada. The court would also note at this juncture that symbolic actions of the Iroquois Grand Council and revived cultural awareness notwithstanding, the rights of the St. Regis Indians can only be determined in light of the Treaty of 1796, Federal statutes and decisions, and New York State’s criminal (here) and Indian laws.
In view of the fact that it was the Seven Nations of Canada who were parties to the Treaty of 1796, and not the Mohawk/Iroquois, and in light of the court’s historical analysis supra, it appears that there is ample justification for the various court opinions, cited supra, holding that it is the Treaty of 1796, not 1794, which is the treaty applicable to the St. Regis Reservation.
*531 Even if'the Treaty of Canandaigua (1794) were applicable to the St. Regis Reservation it would not operate to bar the criminal jurisdiction of State courts over these alleged offenses. This is true for several reasons:
First, article 7 of that treaty (52 Parry, Consolidated Treaty Series, p 237) reads as follows:
“Lest the firm peace and friendship now established should be interrupted by the misconduct of individuals, the United States and Six Nations agree, that for injuries done by individuals on either side, no private revenge or retaliation shall take place; but, instead thereof, complaint shall be made by the party injured, to the other: By the Six Nations or any of them, to the President of the United States, or the Superintendent by him appointed: and by the Superintendent, or other person appointed by the President, to the principal chiefs of the Six Nations, or of the nation to which the offender belongs: and such prudent measures shall then be pursued as shall be necessary to preserve our peace and friendship unbroken; until the legislature (or great council) of the United States shall make other equitable provisions for the purpose.
“note. It is clearly understood by the parties to this treaty, that the annuity stipulated in the sixth article, is to be applied to the benefit of such of the Six Nations and of their Indian friends united with them as aforesaid, as do or shall reside within the boundaries of the United States: For the United States do not interfere with nations, tribes or families, of Indians elsewhere resident.” (Emphasis added.)
The plain language of this section authorizes and in fact seems to anticipate the passage of a statute such as section 232 of title 25 of the United States Code. In this sense the language of article 7 operates as a conditional relinquishment of criminal jurisdiction by the Iroquois. Section 232 of title 25 of the United States Code is in part an exercise of this conditional relinquishment as well as an exercise of Congressional plenary power. The argument is made that the operative language of section 232 may not have been considered equitable within the meaning of article 7 in 1794 by the parties thereto. However, it cannot be seriously *532 contended that section 232 was not “equitable” when enacted in 1948.
Second, even if the article 7 operated to retain jurisdiction by the Iroquois that jurisdiction would only be concurrent with that of the courts of New York State. (United States v Wheeler, 435 US 313, supra.)
Third, although unlike the Treaty of 1789 the Treaty of 1794 does not specifically exclude the Mohawks unless they signed it, the fact remains that they were not present during its negotiation, despite repeated invitations, and they did not sign it.[19] It is interesting to note here that the defense claims that they did sign it, through one Henry Youngbrant. Mr. Youngbrant was the only Mohawk present, however, and never lent his voice to the negotiations, coming forward merely to express his sentiments to Col. Pickering.[20] Additionally, it appears that Mr. Youngbrant was in fact the nephew and “representative” of the very same Joseph Brandt who has been disavowed by the defense as a mere British mercenary and no legitimate Mohawk chief.[21]
The defense claims that it matters not whether the Mohawks signed the treaty inasmuch as the treaty was ratified by the Grand Council of the Iroquois and thereby binds the Mohawks.
Applying fundamental principles of contract law it is obvious that if the Mohawks choose to be bound by a treaty they did not negotiate or sign this would have no binding effect on the other party to the treaty, the United States. It is also obvious that by taking such a position the Mohawks could not hope to bind another nonparty to the treaty, the St. Regis Band.
The court notes that apparently the United States hoped the Mohawks would abide by the treaty, i.e., live peaceably, and indeed even offered them the money equivalent of the *533 “presents” they gave those tribes who did attend and sign.[22] However, this observation still does not change the factual and legal conclusions outlined above.
Fourth, and finally, the defense argues that the Treaty of 1794 must be interpreted in the way the Indians (Mohawks) understood/understand it, citing Worcester v Georgia (6 Pet [US] 515, supra) and Washington v Fishing Vessel Assn. (443 US 658, supra).
It is obvious that this rule of treaty construction would only come into play when the treaty language lends itself to more than one interpretation. The applicable language of article 7 is unequivocal and clear and not subject to any legitimate variations in interpretation. It is worthy of note that the Treaty of 1794 in its final form was the result of numerous drafts, none of the others of which “gave them satisfaction.”[23] It would certainly seem that in this instance the parties who did sign the Treaty of 1794 got essentially what they bargained for.
D. IS THE ST. REGIS RESERVATION THE SOVEREIGN TERRITORY OF THE MOHAWK NATION
The answer to this must be “no”. As must be seen from the discussion in section C, supra, it is not historically clear whether or not the area north of the Adirondacks was geographically ever an “integral part of the Mohawk Nation” as we would understand it.[24] Furthermore, there is historical evidence to indicate that the Mohawks physically, if not legally (highly suspect land “giveaways” notwithstanding)[25] abandoned New York State between the American Revolution and the Treaty of 1794.[26]
Further support for the proposition that the Mohawks physically abandoned New York comes principally from the *534 Papers of Col. Timothy Pickering.[27] From the court’s reading thereof, it is unequivocably established that many of the Mohawks had, prior to 1794, taken up residence in Ontario (448 with Joseph Brandt at Grand River,[28] 200 or so more with John Deserontyon at the Bay of Kentac [sic Quinte]) .[29]
The court would also point out that even were the St. Regis Reservation actually Mohawk territory, it would not and could not be “sovereign” in light of United States v Wheeler (435 US 313, supra).
E. ST. REGIS RESERVATION OUTSIDE FRANKLIN COUNTY
This argument is fallacious. The defendants’ cited statutory description of the borders of Franklin County clearly includes the reservation. Matter of Fischer v Tebo (9 AD2d 470, supra), describes the reservation as “in Franklin County”. The courts of this State, indeed of this Nation, have proceeded under this “premise” for centuries. This is not to deny the quasi-sovereign status of the reservation, but it is within the borders of Franklin County and New York.
F. WHEELER, SECTION 232 OF TITLE 25 OF THE UNITED STATES CODE THE TREATY OF 1796 AND THEIR APPLICATION
The “Treaty with the Seven Nations of Canada, 1796” (53 Parry, Consolidated Treaty Series, pp 109-110) is reproduced herein as follows:
“The agents for the state, having, in the presence, and with the approbation of the commissioner, proposed to the deputies for the Indians the compensation hereinafter mentioned, for the extinguishment of their claim to all lands within the state, and the said deputies being willing to accept the same, it is thereupon granted, agreed and concluded between the said deputies and the said agents, as follows: The said deputies do, for and in the name of the said Seven Nations or tribes of Indians, cede, release and *535 quit claim to the people of the state of New-York, forever, all the claim, right, or title of them, the said Seven Nations or tribes of Indians, to lands within the said state: Provided nevertheless, That the tract equal to six miles square, reserved in the sale made by the commissioners of the land-office of the said state, to Alexander Macomb, to be applied to the use of the Indians of the village of St. Regis, shall still remain so reserved. The said agents do, for, and in the name of the People of the state of New-York, grant to the said Seven Nations or tribes of Indians, that the people of the state of New-York shall pay to them, at the mouth of the River Chazy, on Lake Champlain, on the third Monday in August next, the sum of one thousand two hundred and thirty-three pounds, six shillings and eight-pence, and the further sum of two hundred and thirteen pounds six shillings and eight-pence, lawful money of the said state, and on the third Monday in August, yearly, forever thereafter, the like sum of two hundred and thirteen pounds six shillings and eight-pence: Provided nevertheless, That the people of the state of New-York shall not be held to pay the said sums, unless in respect to the two sums to be paid on the third Monday in August next, at least twenty, and in respect to the said yearly sum to be paid thereafter, at least five of the principal men of the said Seven Nations or tribes of Indians, shall attend as deputies to receive and to give receipts for the same: The said deputies having suggested, that the Indians of the village of St. Regis have built a mill on Salmon river, and another on Grass river, and that the meadows on Grass river are necessary to them for hay; in order, therefore, to secure to the Indians of the said village, the use of the said mills and meadows, in case they should hereafter appear not to be included within the above tract so to remain reserved; it is, therefore, also agreed and concluded between the said deputies, the said agents, and the said William Constable and Daniel M’Cor-mick, for themselves and their associates, purchasers under the said Alexander Macomb, of the adjacent lands that there shall be reserved, to be applied to,the use of the Indians of the said village of St. Regis, in like manner as the said tract is to remain reserved, a tract of one mile square, at each of the said mills, and the meadows on both *536 sides of the Grass river from the said mill thereon, to its confluence with the river St. Lawrence.” It will be noted that nowhere therein do the Caughnawagas (St. Regis Indians, for our purposes) purport to surrender or cede any jurisdiction, over tribal members, criminal or civil, to the United States. Under United States v Wheeler (435 US 313, supra) and its decisional ancestors, that jurisdiction therefore is still retained by the Indians. Congress has never exercised its plenary power to divest them of this jurisdiction, so they still have it, though at this time there exist no Indian courts on the reservation capable of exercising it. What Congress has done, however, is cede Federal jurisdiction to New York State via sections 232 (criminal) .and 233 (civil) of title 25 of the United States Code.
In summary all the above leads the court to the following conclusions:
(1) The St. Regis Indians are still possessed of both civil and criminal jurisdiction over disputes involving only tribe members on their reservation, though at present they have not the judicial machinery necessary to exercise it;
(2) The State of New York, and this court specifically, have criminal (and civil) jurisdiction which is concurrent with that of the Indians with respect to members of their tribe as it does not arise from the same sovereign (United States v Wheeler, supra), and exclusive with respect to all other persons or criminal acts on or off the reservation. (US Code, tit 255, § 232.)
Therefore the motion to dismiss due to lack of jurisdiction will be denied.
(On reargument, October 20, 1980)
The defendants have moved for reargument of the question of this court’s jurisdiction over them on the following grounds: (1) that the court erroneously made a factual and legal determination on the question of an existing dispute resolution procedure without conducting a CPL 210.45 hearing as to factual issues raised in the initial motion; (2) that this court made factual determinations as *537 to the applicability of the Treaty of Canandaigua (7 US Stat 44) without conducting a CPL 210.45 factual hearing and that in so doing it took improper judicial notice of various historical treatises; (3) that the Federal “Major Crimes Act” (US Code, tit 18, § 1153) precludes New York State’s assertion of jurisdiction over any instant crimes charged with the sole exception of riot.
Taking the first point first, counsel’s entire discussion of the dispute resolution procedure followed by the traditionalists begins with the 1794 Treaty of Canandaigua and ends with discussions of appeals and various types of “cases” that are presented to the Grand Council of the Houdinosaunee. The fact (and law) of the matter is that it is the Treaty of 1796 (7 US Stat 55), not the Treaty of Canandaigua (1794), which is the treaty applicable to the St. Regis Reservation (Matter of Fischer v Tebo, 9 AD2d 470). Therefore, any discussions of a dispute resolution procedure which has its roots in the Treaty of 1794 and the Six Nations Confederacy are irrelevant and immaterial. The precedential determination of our Appellate Division, Third Department, is binding on this issue.
This same precedent (Matter of Fischer v Tebo, supra) also disposes of the second ground raised. This court in its initial opinion, insofar as it dealt with this aspect of the jurisdiction question, cited Matter of Fischer v Tebo as controlling (p 527): “It is therefore the settled law of this State, and indeed implicitly of this Nation, that the Treaty of 1796 is the one which, in conjunction with both Federal and State law, governs the rights, especially jurisdictional and governmental, of the Indians on the St. Regis Reservation.” Furthermore, the lengthy historical treatment given the foundation of the St. Regis Reservation in the original opinion was then stated to be merely by way of amplification and explanation (pp 527, 530) : “This conclusion regarding the Treaty of 1796 is amply supported by historical evidence dealing with both colonial era Indian demographics and treaty negotiations. Much of the source material for these historical findings was provided or cited by the defense * * * In view of the fact that it was the Seven Nations of Canada who were parties to the Treaty of 1796, and not the Mohawk/Iroquois, and in light of the court’s historical *538 analysis supra, it appears that there is ample justification for the various court opinions, cited supra,, holding that it is the Treaty of 1796, not 1794, which is the treaty applicable to the St. Regis Reservation.” It follows, then, that this court made no independent finding of fact essential to a determination of this particular issue. Therefore, there was no necessity for nor requirement of a hearing.
There are several additional reasons to deny the motion for reargument on either of the first two grounds. First, counsel for both the People and the defendants had more than ample opportunity to raise the “factual” issues underlying the within motion at the outset, and in fact did so. Second, any witnesses (1) as to who negotiated and/or signed which of the two treaties and (2) as to the origins, existence and legal validity of the Mohawk dispute resolution procedures, would seem to this court to be unavailable due to the passage of time (200 years). Testimony on this issue would then by necessity be hearsay and incompetent. Third, the alleged improper judicial notice is not so in light of the issue of jurisdiction as settled by Matter of Fischer v Tebo (9 AD2d 470, supra), “First” and “Second” (directly above), and the additional observation that some of the sources complained of were cited by counsel (for both sides) in their initial briefs on the jurisdiction question.
The third ground alleged on the motion to reargue concerns the case of People v Edwards (104 Misc 2d 305) and the Federal “Major Crimes Act”. The Edwards case, which dismissed the murder indictment of an Indian on the ground that New York State does not have jurisdiction over those crimes enumerated in the Federal Major Crimes Act (US Code, tit 18, § 1153), was unanimously reversed in a memorandum decision by the Appellate Division (78 AD2d 582) on the express ground that New York does have jurisdiction to try Indians for (all) crimes committed on Indian reservations. Therefore, there is no merit to the defense’s third ground.
If the Edwards case had not been appealed and this court faced with determining its validity and applicability, it would have reached the same conclusion as the Appellate Division. The learned trial court in Edwards, in its search *539 of the legislative record and history of section 232 of title 25 of the United States Code, omitted consideration of probably the most salient feature thereof. It appears that the bill as originally submitted to the Senate contained the following language: “that nothing herein contained shall deprive the courts of the United States of jurisdiction over offenses, defined by the laws of the United States committed by or against Indians on said reservation.” (Hearings before Subcommittee of Committee on Interior and Insular Affairs, US Senate, 80th Cong, 2d Sess, March 9, 1948, p 6.) This language obviously was deleted, and the bill (Sen No. 1683) which passed the house on June 16, 1948 did not contain it. However, the very next matter considered and passed by the House on that date, a bill to confer jurisdiction on the State of Iowa over Indians on two reservations (Sen No. 1820), contained language virtually identical to that which had been deleted from section 232 of title 25 of the United States Code: “Provided, however, that nothing herein contained shall deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on Indian reservations.” (US Code, Cong & Admin News, 1948, vol 1, p 849.) It would thus appear to this court, from a perusal of the various versions and the (House) juxtaposition of the passage of the New York and Iowa statutes, that Congress did intend to give and in fact gave New York State full and complete criminal jurisdiction over Indians.
Accordingly, and in light of all the foregoing, it is hereby ordered that the defendants’ motion for renewal, re-argument, factual hearing, and reconsideration be and the same hereby is denied.

. Golden, History of the Five Indian Nations Depending on the Province of New-York in America, 1747 map, pp xviii, xix; defense map of 1784; see, also, Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 62, p 261a.

. Hough, History of St. Lawrence and Franklin Counties, p 236.

. 1771 map in defense memorandum of law; Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 25.

. Sylvester, History of Ulster County, New York, p 21.

. Sylvester, History of Ulster County, New York, p 21.

. Hough, History of St. Lawrence and Franklin Counties, p 191.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), pp 44, 48, 49.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 60; Hough, History of St. Lawrence and Franklin Counties, p lll.ff.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 65.

. Hough, History of St. Lawrence and Franklin Counties, p 127.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 52.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 53.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 55.

. Hough, History of St. Lawrence and Franklin Counties, p 149.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), p 62.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), pp 134, 138; Hough, at p 176.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), pp 75-86, see espec p 112; Hough, at pp 154,177; see, also, Matter of Fischer, supra, at p 472; U.S. ex rel. Kennedy v Tyler, 269 US 13; Andrews v State, 79 NYS2d 479.

. Frisch, Revitalization, Nativism and Tribalism Among the St. Regis Mohawks (unpub Ph.D. dissertation), pp 91, 92.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 60, pp 209a, 204, 202, 203; vol 62, pp 145, 213.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 62, p 100.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 62, p 108.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 62, p 108.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 60, p 208.

. See, for example, ns 1, 2.

. “Treaty with the Mohawk, 1797,” wherein Mohawk leaders Joseph Brandt and John Deserontyon, who were not Sachems (chiefs) relinquished all Mohawk land claims for $1,000 plus $600 personal expenses. This “treaty” was never ratified by the Grand Council and appears to be fraudulent on its face.

. Ns 14, 18.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vols 60, 62.

.. Johnston, The Valley of the Six Nations, p 52.

. Papers of Timothy Pickering, Massachusetts Historical Society Collection, vol 60, pp 204, 241, 115, 203; vol 62, pp 100, 250.