Froessel, J.
 

 Plaintiffs are the duly elected chiefs of the St. Regis Tribe of the Mohawk Indians, and have instituted this action on behalf of all the members of the tribe. Their claim is that the State of New York has appropriated, pursuant to title 1 of article 5 of the Public Authorities Law, certain
 
 *28
 
 ‘1 land, bed of St. Lawrence River, and water rights, including inherent and intrinsic water power in such river * * * to which the claimants allege original title which has never been extinguished”. Claimants assert “immemorial rights arising prior to white occupation, consisting of immemorial possession and use including original title to those rights which are the subject of the appropriation by the State of New York ”.
 

 In order to ascertain the basis of the claim of the St. Regis Tribe to the land in question, it is necessary to review the relevant historical background. Prior to the Treaty of Paris entered into at the conclusion of the Revolutionary War, the St. Regis Indians used and occupied land on both sides of the St. Lawrence River, as well as islands in the river, among which is one subsequently known as Barnhart’s Island. This island, to which the St. Regis Tribe here claims title, contains 1,692 acres. In 1783 the United States and Great Britain entered into the Treaty of Paris (8 U. S. Stat. 80-83), in article II of which it was provided that the part of the northern boundary of the United States here relevant should be ‘ ‘ along the middle of ’ ’ the St. Lawrence River.
 

 This boundary did not provide a satisfactory guide for the ascertainment of sovereignty over various islands located in the river. With respect to Barnhart’s Island, the record shows that more than nine tenths of the water of the river flowed on the southeasterly side of the island; that a large portion of the island is north of the 45th degree of north latitude (one of the boundaries); that the branch of the river between the island and Canada “ could sometimes in the lowest water be forded * * * [and] was never navigable for boats drawing •over two feet of water [while] * * * any vessels navigating the upper lakes, can always navigate the channel between the Island and Massena ”.
 

 Thus it is not surprising that after the 1783 treaty Great Britain governed Barnhart’s Island, and that it was treated as a part of the township of Cornwall, the inhabitants of said island being taxed by Canada, and serving military duty at Cornwall. This administration of the island continued until 1821-1823.
 

 In 1791 one Alexander Macomb applied to the Land Office of the State of New York for the purchase of a tract of land
 
 *29
 
 in northern New York State which was to include “ all the Islands belonging to this State fronting the said Tract in * * * the river St. Lawrence ”, The surveyor general who was to survey the area covered by the application reported to the Governor: “As it is uncertain which Islands in the River St. Lawrence fall on the New York side of the Line established by Treaty between the United States and the British Government none of those contained in the Contract with Mr. Macomb are comprehended in the above Return ’ ’. On March 3, 1795, letters patent for this part of the Macomb tract were issued to one Daniel McCormick, to whom rights were transferred by Alexander Macomb.
 

 In May, 1796 the State of New York entered into a treaty with tribes of Indians denominating themselves as the Seven Nations of Canada. In that treaty the tribes, including the St. Regis Tribe, agreed to “ cede, release and quit claim to the people of the State of New York forever All the Claim Right or Title of them * # * to Lands within the said State Provided nevertheless that the Tract equal to six miles square reserved in the sale made by the Commissioners of the Land Office of the said State to Alexander Macomb to be applied to the use of the Indians of the Village of St. Regis shall still remain so reserved”. Compensation in addition to the six square mile tract was provided to be paid to the Seven Nations or Tribes of Indians “ for the extinguishment of their Claim to all Lands within the State ’ ’.
 

 In 1806, and again a year later, the question as to which islands in the St. Lawrence River were covered by the letters patent issued to McCormick was brought before the Land Office and the Legislature, the result of which was a request to the Governor “ to adopt and pursue such measures as may be deemed most advisable for effecting the determination and establishment of a line of territory and jurisdiction between this state and the British government on lake Ontario and the river St. Lawrence.” These efforts did not afford McCormick the desired relief, so he asked in 1814 that, until the boundary line was settled, a survey should be made to show which of the islands were “ indisputably within the limits of this state”. In 1817, having obtained only one island in the St. Lawrence, he sold his rights to the remaining islands to David Ogden.
 

 
 *30
 
 In the meantime, following the War of 1812, and in December, 1814, the United States and Great Britain entered into the Treaty of Ghent (8 U. S. Stat. 218-223). Article Sixth of said treaty provided:
 
 “
 
 Whereas, by the former treaty of peace that portion of the boundary of the United States * * * was declared to be ‘ along the middle of said river * * And whereas doubts have arisen what was the middle of the said river, lakes and water communications, and whether certain islands lying in the same were within the dominions of his Britannic majesty or of the United States: In order, therefore, finally to decide these doubts, they shall be referred to two commissioners * * *. The said commissioners shall, by a report or declaration * * # designate the boundary * * * in conformity with the true intent of the said treaty of one thousand seven hundred and eighty-three.” Article Eighth in effect stated that the rights of the Indians are not to be affected by the resettling of the boundary. On June 18, 1822, the commissioners made their report (8 U. S. Stat. 274-277), in which they decided that Barnhart’s Island belonged to the United States.
 

 We here note that in a report made by a committee of the New York State Assembly in 1850 it was stated: “ It appears to your committee that prior to the settlement of the boundary line under the Treaty of Ghent, Long Island, at the outlet of Lake Ontario, lying between Cape Vincent in Jefferson County, and Kingston in Upper Canada, was claimed by both the British and American authorities, and that they exercised concurrent jurisdiction over the same. That the settlement of said boundary line, as a compromise and by way of remuneration for the claims of the United States to the said Long Island, Great Britain gave up Barnhart’s Island to the United States. Your committee are fully satisfied that Barnhart’s Island was ceded to the United States by way of compromise and exchange and not by virtue of the treaty of 1783.”
 

 Likewise in 1856, an Assembly committee stated: ‘ ‘ That the commissioners, in retracing the boundary line between the United States and the British Provinces, under the Treaty of Ghent,.in 1822, exchanged these two islands [Baxter and Barn-hart] for others in the St. Lawrence river, and they were thereby declared to be within the jurisdiction of the United States.”
 

 
 *31
 
 In 1823 David Ogden applied for and received a patent from the State of New York covering Barnhart’s Island as well as others in the St. Lawrence River. At this point, then, title to Barnhart’s Island would appear to be vested in Ogden.
 

 We now turn to the conduct of the St. Regis Tribe with respect to Barnhart’s Island. In 1795 the tribe gave a lease of the whole island to George Barnhart for 999 years at an annual rental of $30. In 1806 the Indians renegotiated the lease, increasing the amount of the rental to $60 per year and shortening the term to 99 years. In March, 1817 the lease was again renegotiated, the amount of the annual rental further increased to $150. There is evidence in the record that ‘
 
 ‘
 
 The Indian lease to Barnhart was recognized by the British government as conferring title according to its terms ”. Rents were collected from the tenants by officials of the Canadian Government from 1804 to 1822. Thus in 1823 when the State of New York issued letters patent for Barnhart’s Island, that island was occupied by tenants who had substantially improved property thereon.
 

 Shortly after the letters patent were issued to David Ogden, he instituted an ejectment suit against the then occupants. In the 1850 report of the committee of the Assembly, it was stated: ‘ ‘ Upon the trial, the defendants offered their Indian title in evidence, but the court held that they could not look behind the patent of the State, but were bound to recognize the sovereignty of the State, and its patents. Judgment of ouster was therefore had against the defendants. They were then forced to purchase of the Messrs. Ogden, or abandon their farms. The Ogdens charged them the full value of. the land with their improvements added; thus compelling them to pay for what their own labor and money had accomplished. ’ ’ There was evidence that the entire island was sold to John Barnhart in 1826 for $11,434.75, but that he defaulted in payments.
 

 In 1843 the Commissioners of the Land Office of the State of New York, to whom a petition of the St. Regis Indians “ for a conveyance to them of certain islands in the River St. Lawrence, or an equivalent in money” was referred, reported: “ the State of New-York has been the owner of the fee to these islands since the treaty of 1783; that they as early as the year 1791, exercised acts of ownership over the same by an actual
 
 *32
 
 contract of sale; that such claim of title has been uninterrupted by the repeated recognition of the validity of such original contract of sale up to the time of the execution of the same; that the delay of such execution upon the part of the State was in no manner induced by a want of confidence of the State to the title to these islands, but from the difficulty of ascertaining the true lines of territory and jurisdiction between the State of New-York and the British Provinces; that in the year 1796, ‘ The Seven Nations of Canada ’ whom the petitioners would claim to represent, by a solemn treaty then made and ratified, quit-claimed all their right and title to all lands located in the State of New York; by means of which, the whole title of such Indians to any lands within this State became forever extinguished, except to such small portion in such treaty reserved for the use in such treaty expressed.
 

 “ The commissioners of the Land-Office are of the opinion that the title to these tribes was not the less extinguished by the treaty of 1796, which was a general quit-claim of title to all lands within the State from the fact that the lines of boundary beween this State and the British Provinces had not been definitely settled, and considering the character and object of the reservation made in such treaty, the reference therein to the contract made with Macomb in 1791 for the description of such reservation, and that the representatives of this original contract were parties to this treaty, they are no less satisfied that such general extinguishment of title is equally within the spirit as the letter of such treaty. The Commissioners of the Land-Office are therefore of the opinion that the petitioners have neither in law or equity the least claim to the relief sought in their petition.”
 

 In direct conflict with the views above expressed was a report of an Assembly committee on claims made by George Barnhart for compensation in 1850. That committee impliedly referred to the 1843 report of the Land Office Commissioners when it said: “It was for a long time .contended in the case of Asa Baxter, who held Baxter’s Island in the St. Lawrence until 1823, under precisely the same circumstances as are here narrated, that the State acquired the title to that island by a treaty made with the Indians in 1796. It is presumed that the State patented the island now in question under the same claim.
 
 *33
 
 The legislature of 1847, however, repudiated the claim of the State to Baxter’s island under the Indian treaty of 1796, and appointed commissioners to appraise his damages by reason of his eviction by the Ogdens. An act for the payment of the award of the commissioners has passed both houses at the present session. The claim of petitioners is a more strong-one if possible than that of Baxter. While his island was found to be within the limits of this State by the boundary as established by the treaty of 1783, and consequently within the letter of the Indian treaty of 1796, Barnhart’s island only became the property of this State by the treaty of Ghent.” An act was passed authorizing the appointment of commissioners, and the commissioners reported a total amount of damages of $6,597. That report stated that the title of the Barnharts was “ derived in the first instance from an Indian lease * * * which lease was recognized as valid by the proper authorities of Canada ”. They also appear to have recognized that the fee interest characterized as “ a remote reversion at the end of nine hundred and ninety-nine years ” was in the Indians.
 

 In January, 1851 the Commissioners of the Land Office submitted a report to the Assembly dealing with the rights of the St. Regis Tribe in relation to Barnhart’s Island. They there stated:
 

 “ The Commissioners have no peculiar means of knowing whether the two islands were within the jurisdiction of the United States before the treaty of Ghent, but it is fair to assume from the instructions to Mr. Ogden, the surveyor, that they were not included. * * *
 

 “ If the lands fell within the jurisdiction of the United States by the line established under the treaty [of Ghent], the Commissioners are clearly of the opinion that the State had no right to make any grant to the Ogdens, by which the Indians were deprived of any rents or advantages, without making-compensation. ’ ’
 

 The report then continued to state the facts relating to the leasing of the island by the Indians to the Barnharts, and it concluded that if the existence of these leases could be shown, “the Commissioners entertain no doubt that justice and good faith to the Indians require the State to pay to them an annuity
 
 *34
 
 equal to the annual amount of rent. * * * It is probable that the Legislature will be called upon to pay a large amount of damages under the appraisal by the commissioners.”
 

 The report of the Committee on Indian Affairs made in 1856 stated: “ The committee regard the title of the said Indians to said islands as unquestioned. * * * The justice and propriety of the above appropriations [to the Barnharts and to Baxter] was fully and elaborately discussed and conclusively shown * * *. The rights of the lessee cannot well be sanctioned and respected without, at the same time, sanctioning the title of the lessor. This proposition is too plain to the comprehension of the most indifferent mind, to require elaboration by the committee.
 

 1 ‘ It has long been the avowed, as well as the practical policy of this State, at least to deal justly by the remaining remnant of the aboriginal inhabitants of this country. We are their guardians, they our wards. We are increasing, they fast decreasing, in numbers and estate.
 

 “In any view which the committee can take of the subject referred, they can see no good reason why an appropriation should not be made to the petitioners equal to the annual rents from 1822 to this time, together with a sum which, put at interest at the rate of 6 per cent, would produce the rents reserved; or a sum which in 1822 would have extinguished the Indian title to said islands, with interest thereon from that time, which, by the proofs, would have been $1,000 for each island—
 

 Being ............................................ $2,000
 

 Add interest at 6 per cent for 33 years................ 3,960
 

 $5,960
 

 Or thus:
 

 The rents, at $120 per year for 33 years.............. $3,960
 

 To which add $1,000 for each island, as commutation
 

 for title and rent............................... 2,000
 

 $5,960”
 

 In April, 1856 an Act authorizing the grant of said $5,960 “ for the payment and in full of the claim of the St. Regis tribe of Indians, for the sale by the State of two certain islands in the
 
 *35
 
 river St. Lawrence, known as Barnhart’s and Baxter’s islands, which belonged to the said tribe ”, was passed by the Legislature. The Act further stated:
 

 11 The above sum shall be paid by the treasurer, on the warrant of the comptroller, out of any money in the treasury not otherwise appropriated, to the order of Southerland Colquhoun, the agent of the British portion of the St. Regis tribe of Indians, and William A. Dart, of Potsdam, in the county of St. Lawrence, to be by them distributed to the said tribe * * *
 

 1 ‘ The said Southerland Colquhoun and William A. Dart shall before receiving any portion of the sum hereby appropriated, execute and file in the office of the comptroller of this state, a bond ’ ’.
 

 The ledger of the Comptroller indicates that on April 30,1856 $5,960 was paid out to ‘ ‘ St. Regis Indians, in full of their claim for the sale by the State of two Islands in the River St. Lawrence, known as Earnhardt’s & Baxter’s Is.”. An affidavit in the record indicates that a search of the records of the Department of Audit and Control has failed to locate (1) any bond executed by Colquhoun and Dart; (2) an account to the Comptroller of the appropriation of the said $5,960, or any vouchers relating to the distribution of that sum.
 

 The situation remained thus, with the Indians asserting no claim to title to the island until after the State appropriated it for the development of a power project, after which the present claim for $33,800,000 was made. The State moved to dismiss the claim on the grounds that (1) it did not state a cause of action; (2) claimants lacked legal capacity to sue the State of New York; (3) there was an incurable defect of parties, and (4) any claim which had existed had been released. The Court of Claims denied the motion, finding that there were triable issues of fact on the first and last grounds. The Appellate Division reversed on the ground that the Indians had no legal title to the real property in question, and that in any event the record showed that they had released whatever claim they had.
 

 On this appeal, the State concedes that the claimants have capacity to sue, and they do not argue that there is a defect of indispensable parties. They do contend that (a) the treaty of 1796 divested claimants of title to Barnhart’s Island; (b) the payments by the State in 1856 put an end to any liability which
 
 *36
 
 the State may ever have incurred, and (c) any lingering right in the Indians after 1856 was at most a right of occupancy, which the Supreme Court of the United States has held to be not compensable in appropriation proceedings. The St. Begis Tribe argues that the right, title and interest to Barnhart’s Island is still in them, and that compensation for that property interest is mandated by the New York State Constitution.
 

 We turn now to the first of the two grounds urged in this court as a basis for dismissal of the claim, to wit, that it is legally insufficient. This point having been raised by a motion under subdivision 4 of rule 106 of the Buies of Civil Practice, we may not consider matters beyond the face of the complaint except insofar as we may take judicial notice of them by common law or by statute (Bichardson on Evidence [8th ed.], §8
 
 et seq.-,
 
 Civ. Prac. Act, § 344-a) and thereby read them into the complaint
 
 (Pfleuger
 
 v.
 
 Pfleuger,
 
 304 N. Y. 148;
 
 Walsh
 
 v.
 
 Trustees of New York & Brooklyn Bridge,
 
 96 N. Y. 427, 438;
 
 First Nat. Bank of Genoa
 
 v.
 
 American Sur. Co.,
 
 239 App. Div. 282, 284). Affidavits may of course not be considered
 
 (Purdy
 
 v.
 
 McGarity,
 
 262 App. Div. 623;
 
 King
 
 v.
 
 Krischer Mfg. Co.,
 
 220 App. Div. 584). The rule is otherwise as to that phase of the motion brought under subdivision 6 of rule 107, but the facts brought to the court’s attention under that rule may not be considered under subdivision 4 of rule 106 of the Buies of Civil Practice
 
 (Benvin & Co.
 
 v.
 
 American Safety Razor Corp.,
 
 282 App. Div. 922).
 

 Considering the claim alone, then, when read in the light of relevant treaties and statutes, of which we may clearly take judicial notice, construing it liberally, and recognizing that on its challenge of the claim for legal insufficiency the State accepts as true the relevant allegations of fact and the reasonable inferences that may be drawn therefrom (Civ. Prac. Act, § 275;
 
 Garvin
 
 v.
 
 Garvin,
 
 306 N. Y. 118, 120;
 
 Denihan Enterprises
 
 v.
 
 O’Dwyer,
 
 302 N. Y. 451, 458;
 
 Blanshard
 
 v.
 
 City of New York,
 
 262 N. Y. 5, 12;
 
 Dyer
 
 v.
 
 Broadway Cent. Bank,
 
 252 N. Y. 430, 432-433), we may not say as a matter of law that no possible valid claim of title has been set forth for the reasons hereinafter stated.
 

 Moreover, we reach the same conclusion even if we regard the official documents, such as the reports of the committees of the Legislature, as matters of which we could take judicial notice.
 
 *37
 
 Since both parties to this litigation, as well as the Appellate Division, seem to have proceeded upon that theory, we have considered the claim in the setting of the treaties, statutes and official documents, and its historical background. So considered, the claim presents many interesting questions.
 

 No one disputes that the St. Regis Tribe of Mohawk Indians occupied Barnhart’s Island prior as well as subsequent to the Treaty of Paris in 1783, which treaty on its face seemed to allot that island (north of “ the middle of ” the St. Lawrence River) to the British. Was that occupancy subsequently recognized as a right of possession by the State of New York! Did the St. Regis Tribe, by the Treaty of. 1796, when it ceded its lands “ within the State ” (excepting the six square miles reserved), intend to include said Barnhart’s Island, from which they were then collecting rent through agents of the British Government? Could the Treaty of Ghent operate retroactively as of the time of the Treaty of Paris so as to extinguish any property rights of the St. Regis Tribe? What effect did the Ogden ejectment action have on the rights of the Indians, particularly in the light of the subsequent conflicting reports of the Legislative Committees? Did the Legislature of this State recognize that- the Indians had rights by appropriating a sum of money therefor in 1856? To say the least, the rights of the St. Regis Tribe in Barnhart’s Island prior to the time the Legislature made an award to them present triable issues upon this motion challenging the sufficiency of their claim.
 

 It appears to be settled that the bare right of occupancy by the Indians (conveyable by them only to the State) is not the kind of property right which must, as a matter of due process, be compensated for by the State upon its taking title to Indian lands
 
 (Tee-Hit-Ton Indians
 
 v.
 
 United States,
 
 348 U. S. 272, 279
 
 et
 
 seq.;
 
 United States
 
 v.
 
 Tillamooks,
 
 341 U. S. 48, 49;
 
 United States
 
 v.
 
 Santa Fe Pacific R. R. Co.,
 
 314 U. S. 339, 347;
 
 Kwash-Ke-Quon Indians
 
 v.
 
 United States,
 
 137 U. S. Ct. Cl. 372, 373-374) unless, of course, a statute authorizes it (U. S. Code, tit. 25, § 70a;
 
 Otoe & Missouria Tribe of Indians
 
 v.
 
 United
 
 States, 131 F. Supp. 265, 283-285, cert. denied 350 U. S. 848;
 
 Upper Chehalis Tribe
 
 v.
 
 United States,
 
 155 F. Supp. 226; cf. 69 Harv. L. Rev. 150-151).
 

 
 *38
 
 The reports of the Legislative Committees, however, appear to furnish evidence of a recognition by the State of some rights on the part of the Indians in Barnhart’s Island, and thus an implied expression of intent to repay them for the taking of that interest. The policy of this State, as that of others in the Union, was to deal with the original Indian nations “ as proprietors of the soil which they claimed and occupied, but without the power of alienation, except to the governments which protected them * * *. These governments asserted and enforced the exclusive right to extinguish Indian titles to lands, enclosed within the exterior lines of their jurisdictions, by fair purchase, under the sanction of treaties ” (3 Kent’s Comm. 385 [12th ed.]). As we stated in
 
 People ex rel. Cutter
 
 v.
 
 Dibble
 
 (16 N. Y. 203, 212-213, affd. 62 U. S. 366): “ They have been treated, since our first intercourse with them, as
 
 quasi
 
 independent nations or tribes, having governments and institutions and national attributes of their own; but, both collectively and individually, feeble and helpless compared with the whites, and therefore needing constantly the protection and paternal care of the government. ’ ’ This of course does not require that compensation must be made by the courts rather than left to the consciences of the Legislatures, but it does evidence the policy of liberal dealing with the Indians on the part of the State.
 

 As to the second ground urged by the State, the record clearly shows that the Legislature in 1856 duly compensated the St. Regis Tribe for their claim or interest in this property. It will be recalled that the Legislature had the matter brought before it by the St. Regis Tribe, who sought “ an allowance to them by the State for certain islands ”. The tribe was cognizant of the previous awards to Baxter and Barnhart for the value of their interest in the lands, and they demanded the same treatment, although it had been previously denied them.
 

 The committee in the Legislature recognized that the practice of the Canadian Government when dealing with interests based upon long-term leases, such as were involved with regard toBarnhart’s Island, was to “ issue patents therefor to the lessees, on being paid a sum which, at an interest of 6 per cent, would produce the rents reserved”. Accordingly, the committee recommended an appropriation “ to the petitioners equal to the annual rents from 1822 to this time, together with a sum which,
 
 *39
 
 put at interest at the rate of 6 per cent, would produce the rents reserved; or a sum which in 1822 would have extinguished the Indian title to said islands, with interest thereon from that time ”. Appellants claim that the sum appropriated was not for the purchase of the Indians’ title but merely as a temporary compensation to them for loss of rentals on their lease. This contention is simply not borne out on an examination of the report of the Legislature in 1856.
 

 It is further contended that there is no evidence that the sum appropriated was ever paid to the St. Regis Tribe, and that a search failed to reveal the bond to have been posted by the persons who were to have turned over the money to the Indians. The loss of this document is amply accounted for, in our opinion, by the statement of the deputy comptroller that such a record as this is not among those required by statute to be kept; and that it was felt that so long- as there was in existence a record indicating that the payment had been made, it was unnecessary to retain this document also. In this respect, the presence in the records of the Comptroller of the entry stating that the money had been paid on April 30, 1856 to the St. Regis Indians “ in full [satisfaction] of their claim” raises a presumption that such payment was made, and obligates the claimants to come forward with more than the bare assertion that the money was not so paid
 
 (Bean
 
 v.
 
 Tonnele,
 
 94 N. Y. 381, 386;
 
 Conkling
 
 v.
 
 Weatherwax,
 
 181 N. Y. 258, 267; Richardson on Evidence [8th ed.], § 89; see 9 Wigmore on Evidence [3d ed.], § 2517). Being so assiduous in their attempts to obtain compensation for their rights in Barnhart’s Island, it may be presumed that they would show like diligence in calling to the attention of the Legislature any failure to comply with its expressed obligations.
 

 The final point raised by claimants is that even if the 1856 payment be intended as a satisfaction of the claims of the Indians to Barnhart’s Island, it cannot effect that result as it is in conflict with the Indian Intercourse Act (U. S. Code, tit. 25, § 177).
 

 In
 
 Seneca Nation
 
 v.
 
 Christie
 
 (126 N. Y. 122), we stated (p. 142) with regard to that Act: “ There is room for question whether the act of 1802 was intended to apply to treaties made by a sovereign state with tribes within the state for the extinguishment of the Indian title to lands therein ”, Our language in
 
 *40
 
 that case was the basis of a holding in
 
 United States
 
 v.
 
 Franklin County
 
 (50 F. Supp. 152) to the effect that the provisions of the Indian Intercourse Act do not apply to the State of New York. No authority has been cited to us which would indicate a contrary result.
 

 In any event, we have here the situation where the State of New York duly negotiated the Treaty of 1796 with various Indian tribes, including the St. Begis Tribe, in the presence of a Federal Commissioner. Thereafter a dispute arose over the meaning and application of the terms of that treaty. Certainly the State had the right to settle this dispute under that treaty through a legislative grant of compensation (see N. Y. Const., art. I, § 13). Thus this was not the negotiation of a new purchase of property from an Indian tribe, but rather the adjustment of a claim that had arisen as the result of the ambiguous language of the 1796 treaty.
 

 The judgment should be affirmed, without costs.
 

 Chief Judge Conway and Judges Desmond, Dye, Fuld, Van Voobhis and Burke concur.
 

 Judgment affirmed.