922 F.2d 1026
 UNITED STATES of America, Appellee,
v.
Roderick Alex COOK, Eli Tarbell, Anthony Laughing and Gerald
Laughing, James Joseph Burns, Defendants,
Roderick Alex Cook, Eli Tarbell and Anthony Laughing,
Defendants-Appellants.
UNITED STATES of America, Appellee,
v.
Peter BURNS, Sr., Defendant-Appellant.
 Nos. 76, 105, 106 and 107, Dockets 90-1070, 90-1072, 90-1168
and 90-1179.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 10, 1990.
Decided Jan. 7, 1991.
 
 John A. Piasecki, Malone, N.Y. (Vaughn N. Aldrich, Hogansburg, N.Y., of counsel), for defendant-appellant Cook.
 John A. Cirando, Syracuse, N.Y. (D.J. Cirando and Patrick J. Haber, Syracuse, N.Y., of counsel, Mary B. Ruddy, law student, on the brief), for defendants-appellants Tarbell, Laughing and Burns.
 Ezra Friedman, Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty. N.D. New York, Syracuse, N.Y., of counsel), for appellee.
 Raymond E. Kerno and Elliot I. Susser, Lake Success, N.Y. (Lysaght, Lysaght & Kramer, Lake Success, N.Y., of counsel), filed a brief for amicus curiae James Burns.
 Before WINTER and MINER, Circuit Judges, and LASKER, Senior District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Defendants-appellants Eli Tarbell, Anthony Laughing and Peter Burns, Sr. appeal from convictions entered on January 16, 1990, February 26, 1990 and February 27, 1990, respectively, in the United States District Court for the Northern District of New York. Tarbell pled guilty to the unlawful use and possession of gambling devices in Indian country. 15 U.S.C. Sec. 1175 (1988). Laughing and Burns pled guilty to violations of section 1175 and to the operation of illegal gambling businesses. 18 U.S.C. Sec. 1955 (1988). Defendant-appellant Roderick Alex Cook was found guilty, following a jury trial, of violating section 1175.
 
 
 2
 In pre-trial motions to dismiss their indictments, appellants raised important issues relating to the interpretation and application of several statutes. They claimed that the district court lacked subject matter jurisdiction because the offenses for which they were prosecuted did not occur in Indian country, as required by section 1175. Appellants maintained that 25 U.S.C. Sec. 232 (1988) granted exclusive prosecutorial jurisdiction to the State of New York, precluding the federal prosecutions in their cases. They also argued that both 15 U.S.C. Sec. 1175 and 18 U.S.C. Sec. 1955 were preempted by the enactment of the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. Sec. 2701 et seq. (1988), and of 18 U.S.C. Sec. 1166 (1988), which provides criminal penalties for violations of the IGRA; that the IGRA's grace period applies to the activities of Tarbell, Laughing and Burns; and that even if the IGRA did not preempt the statutes at issue, the government failed to prove that their activities violated state law, an essential element of an offense under section 1955. Other contentions were that section 1175, as applied, violates equal protection principles and that the government must prove that Tarbell and Laughing knew their conduct violated the law.
 
 
 3
 In denying the motions, Judge McCurn rejected all arguments advanced by appellants. The same arguments are advanced on this appeal. In addition, appellant Cook challenges the sufficiency of the evidence presented to the jury, particularly with respect to the government's proof that he operated "slot machines." Appellants Laughing and Burns challenge their sentences. They object to the four level increase in offense levels for "role in the offense." Laughing objects to Judge McCurn's refusal to grant him a two level reduction in sentence for "acceptance of responsibility." We affirm the district court in all respects.
 
 BACKGROUND
 
 4
 Roderick Alex Cook was convicted after a jury trial of the use and possession of gambling devices in Indian country under 15 U.S.C. Sec. 1175. The conviction stems from the events of December 16, 1987, when the New York State police raided Cook's establishment, the Night Hawk Cafe, and seized 62 slot machines. The conviction of Eli Tarbell for the same offense arose in consequence of the events of December 16, 1987, when the police entered his restaurant, Bear's Den, and seized 77 slot machines. On September 14, 1988 and June 6, 1989, the police again raided the restaurant and seized an additional 82 slot machines.
 
 
 5
 Anthony Laughing, owner of Tony's Vegas International ("TVI"), was convicted of, inter alia, conducting an illegal gambling business, in violation of 18 U.S.C. Sec. 1955, and the use and possession of slot machines in Indian country, in violation of 15 U.S.C. Sec. 1175. Among other gaming materials observed at TVI during a police raid on June 6, 1989, were 148 slot machines, 7 black jack tables, 3 poker tables, 2 roulette wheels and 1 "craps" table.
 
 
 6
 Peter Burns, Sr., co-owner of Burns Casino, was also convicted of violating 18 U.S.C. Sec. 1955 and 15 U.S.C. Sec. 1175. His gambling business included the operation of slot machines, black jack tables and roulette wheels.
 
 
 7
 All of appellants' alleged gambling establishments were located in the town of Bombay, Franklin County, New York. That area is home to appellants' Indian tribe, the St. Regis Akwesasne Mohawk Indians.
 
 
 8
 Prior to trial, appellants moved to dismiss the indictments on the ground that the court lacked subject matter jurisdiction because the offenses for which they were indicted did not occur in Indian country as defined by 18 U.S.C. Sec. 1151. They claimed that the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. Sec. 2701 et seq., and 18 U.S.C. Sec. 1166, which provides criminal penalties for violations of the IGRA, "preempted" the application of 15 U.S.C. Sec. 1175 and 18 U.S.C. Sec. 1955. After a hearing, Judge McCurn ruled as a matter of law that the events occurred in Indian country. Similarly, he rejected the claim that 15 U.S.C. Sec. 1175 and 18 U.S.C. Sec. 1955 were superceded by the IGRA and 18 U.S.C. Sec. 1166. United States v. Burns, 725 F.Supp. 116, 124 (N.D.N.Y.1989).
 
 
 9
 Tarbell, Laughing and Burns entered conditional pleas of guilty, after their motions to dismiss the indictments were denied by Judge McCurn. Only Cook proceeded to trial.
 
 
 10
 At trial, the government introduced evidence, including the testimony of an employee of the Bureau of Indian Affairs ("BIA"), that the events occurred in Indian country. Also, the written decision of Judge McCurn disposing of the pre-trial motions was received by the trial judge (Van Graafeiland, J.).
 
 
 11
 After the government rested, Cook moved for a directed verdict of acquittal on the ground that the government failed to prove that he owned slot machines as defined by the statute. In response to Cook's assertion that expert testimony must be presented establishing that the slot machines each contained a "drum or reel with insignia" or that upon application of an element of chance, money or property was dispensed, the judge stated: "The machine is right here before the jury. It's very obvious what it is. I think very few people haven't seen a slot machine at some time or other, and this is obviously a slot machine." The court denied the motion.
 
 
 12
 On the issue of Indian country, the judge asked the defense if it had any evidence demonstrating that the St. Regis lands were not in Indian country. Besides the introduction of the Treaty of 1796, for the purpose of showing that the St. Regis Indians were not within Indian country, no other evidence was presented. The court then ruled from the bench that the area at issue was located in Indian country.
 
 DISCUSSION
 I. Jurisdictional claims
 
 13
 After a jury trial conducted by Judge Van Graafeiland, Cook was convicted of using slot machines in Indian country, in violation of 15 U.S.C. Sec. 1175. Only he argues, on appeal, that the district court lacked subject matter jurisdiction because the St. Regis lands are not Indian country and should have submitted the issue to the jury in any event.
 
 
 14
 Section 1175 provides, in relevant part, that:
 
 
 15
 It shall be unlawful to ... possess, or use any gambling device ... within Indian country as defined in [18 U.S.C. Sec. 1151].
 
 Section 1151 defines Indian country as:
 
 16
 (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government ..., (b) all dependent Indian communities within the borders of the United States ... and (c) all Indian allotments, the Indian titles to which have not been extinguished....
 
 
 17
 18 U.S.C. Sec. 1151 (emphasis supplied). The government contends that the activities for which Cook was prosecuted occurred in Indian country because the St. Regis tribe is within a "reservation" or, in the alternative, is a "dependent Indian community." Cook argues that it is neither of those. Both the government and Cook provided extensive evidence of the origins of the tribe in support of their contention that it is or is not within a "reservation." We find it unnecessary to resolve the issue of whether the St. Regis tribe is within an Indian "reservation" because the evidence reveals that it is a dependent Indian community.
 
 
 18
 To determine whether a particular Indian tribe is a dependent community, it is necessary to examine the (1) nature of the area; (2) the relationship of the inhabitants in the area to the Indian tribes and the federal government; and (3) the established practice of government agencies toward that area. United States v. Martine, 442 F.2d 1022, 1023-24 (10th Cir.1971); see State of Alaska v. Native Village of Venetie, 856 F.2d 1384, 1390-91 (9th Cir.1988); United States v. Azure, 801 F.2d 336, 338-39 (8th Cir.1986); United States v. Levesque, 681 F.2d 75, 77-78 (1st Cir.), cert. denied, 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982). "The phraseology in issue thus seems intended to afford federal criminal jurisdiction over [offenses] committed by Indians in communities which ... are both 'Indian' in character and federally dependent." Levesque, 681 F.2d at 77.
 
 
 19
 On the issue of Indian country, the trial judge initially received into evidence the Treaty of 1796--entered into between the United States, the State of New York and the St. Regis Mohawks--which established a six-mile tract of land for the occupancy of the St. Regis Indians. See St. Regis Tribe of Mohawk Indians v. State, 5 N.Y.2d 24, 29, 177 N.Y.S.2d 289, 291, 152 N.E.2d 411, 412 (1958), cert. denied, 359 U.S. 910, 79 S.Ct. 586, 3 L.Ed.2d 573 (1959). Additionally, evidence on the nature of the area, the inhabitants and the relationship between the federal government and the Indians was provided by Dean A. White, an employee of the BIA.
 
 
 20
 White testified that the six-mile area is inhabited by approximately 3,000 St. Regis Mohawk Indians. He further testified that the tribe is a federally recognized tribe. See 51 Fed.Reg. 25,115 (1986) (tribe recognized as having a "special relationship" with the United States). The BIA provides the St. Regis tribe with monies for education, housing and training programs, social services and the administration of the tribal government. Loans to both the tribe and its individual members are guaranteed by the BIA. Finally, the BIA is involved in the planning and funding of roads within the reservation and is charged with maintaining the integrity of the lands and resources. We think that there was ample evidence from which Judge Van Graafeiland properly could conclude that the St. Regis tribe is a dependent community. See United States v. Sandoval, 231 U.S. 28, 47-48, 34 S.Ct. 1, 6-7, 58 L.Ed. 107 (1913).
 
 
 21
 Cook also takes issue with the failure of Judge Van Graafeiland to submit the question of whether the area at issue was a dependent Indian community and with his instruction to the jury to that effect. The jury was instructed that it need only decide whether the offenses charged in the indictment occurred.
 
 
 22
 In cases where the exercise of federal jurisdiction over a geographic area is necessary to vest jurisdiction in the federal courts, the court may determine as a matter of law the existence of such jurisdiction. United States v. Jones, 480 F.2d 1135, 1138 (2d Cir.1973) (the issue of acceptance of federal jurisdiction over VA hospital was properly decided by the judge not the jury); see also United States v. Gipe, 672 F.2d 777, 779 (9th Cir.1982). Determinations of whether the site of an offense is Indian country have been held to be for the court alone. United States v. Sohappy, 770 F.2d 816, 822 n. 6 (9th Cir.1985), cert. denied, 477 U.S. 906, 106 S.Ct. 3278, 91 L.Ed.2d 568 (1986); United States v. Deon, 656 F.2d 354, 357 (8th Cir.1981); United States v. Morgan, 614 F.2d 166, 170-71 (8th Cir.1980); Levesque, 681 F.2d at 78 ("Whether the crime occurred in Indian country was thus a jurisdictional fact susceptible of determination without reference to any of the facts involved in determining ... guilt or innocence."). In this case the question of whether the St. Regis territory is Indian country was one properly decided by Judge Van Graafeiland without submission of the issue to the jury.
 
 
 23
 Tarbell, Laughing and Burns also argue that by virtue of 25 U.S.C. Sec. 232, New York State has exclusive jurisdiction to prosecute Indians for crimes committed by them on reservations within the state. 25 U.S.C. Sec. 232 provides, in pertinent part, that:
 
 
 24
 The State of New York shall have jurisdiction over offenses committed by or against Indians on Indian reservations within the State of New York to the same extent as the courts of the State have jurisdiction over offenses committed elsewhere within the State.
 
 
 25
 Appellants invite us to interpret the statute as a complete surrender of all jurisdiction to the State of New York. The district court found that prior to the enactment of section 232, the federal government had exclusive jurisdiction to prosecute crimes committed by or against Indians within Indian country. It held that absent an explicit abdication of federal jurisdiction by Congress in section 232, none could be implied. Burns, 725 F.Supp. at 122. We agree with that holding, but address some of appellants' arguments advanced against it.
 
 
 26
 Our analysis " 'must begin with the language of the statute itself.' " Bread Political Action Committee v. Federal Election Commission, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982) (quoting Dawson Chemical Co. v. Rohm & Haas Co., 448 U.S. 176, 187, 100 S.Ct. 2601, 2608-09, 65 L.Ed.2d 696 (1980)). Moreover, "[j]urisdictional statutes are to be construed 'with precision and with fidelity to the terms by which Congress has expressed its wishes.' " Palmore v. United States, 411 U.S. 389, 396, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973) (quoting Cheng Fan Kwok v. Immigration & Naturalization Serv., 392 U.S. 206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968)).
 
 
 27
 The text of section 232 provides that "The State of New York shall have jurisdiction." Plainly absent are the terms "exclusive" or "complete." The legislative history also does not support the interpretation urged by appellants. Significantly absent is any allusion to a complete surrender of jurisdiction. H.R.Rep. 2355, 80th Cong., 2d Sess., reprinted in 1948 U.S.Code Cong.Serv. 2284 ("H.R. Rep. 2355"). Appellants refer to a letter written by the Undersecretary of the Department of the Interior, in which he suggested that the proposed bill include an express reservation of federal jurisdiction. H.R.Rep. 2355, at 2286-87. They maintain that by rejecting the suggestion, Congress therefore desired to relinquish all federal authority. The failure of Congress to adopt this recommendation, however, is not a telling indication of congressional intent.
 
 
 28
 Appellants also cite a host of cases in support of the contention that section 232 granted exclusive jurisdiction to New York State. See, e.g., Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 471 n. 8, 99 S.Ct. 740, 746 n. 8, 58 L.Ed.2d 740 (1979) (section 232 surrendered authority to New York State); Oneida Indian Nation of New York State v. County of Oneida, 414 U.S. 661, 679, 94 S.Ct. 772, 783, 39 L.Ed.2d 73 (1974) ("New York and federal authorities eventually reached partial agreement in 1948 when criminal jurisdiction over New York Indian reservations was ceded to the State"); United States v. Devonian Gas & Oil Co., 424 F.2d 464, 468 (2d Cir.1970) (section 232 "relinquished the criminal and civil jurisdiction of the United States over New York Indians"); Anderson v. Gladden, 188 F.Supp. 666, 677 (D.Or.1960) (section 232 "surrendered to the state of New York complete jurisdiction over all crimes committed on Indian Reservations within the state"), aff'd, 293 F.2d 463 (9th Cir.), cert. denied, 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961). These cases are not controlling because none resolved the jurisdictional issue presented here. Other cases cited by appellants in support of their contention do not mention abdication of jurisdiction. See, e.g., People v. Edwards, 78 A.D.2d 582, 582, 432 N.Y.S.2d 567, 568 (4th Dep't 1980) ("jurisdiction ... was granted to New York in 1948 by the enactment of section 232").
 
 
 29
 The plain language of the statute leads us to conclude that section 232 extended concurrent jurisdiction to the State of New York. If Congress intended by enacting 25 U.S.C. Sec. 232 to surrender all federal jurisdiction, it could have said so in 1948 when section 232 was enacted. That is exactly what it did in 1970 when it amended 18 U.S.C. Sec. 1162 to give six states exclusive jurisdiction over criminal and private civil matters involving Indian reservations within the particular state. See Pub.L. No. 91-523, Sec. 2, 84 Stat. 1358 (1970).
 
 
 30
 II. Claim that the IGRA Repealed sections 1955 and 1175
 
 
 31
 Appellants Laughing and Burns contend that the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. Sec. 2701 et seq., and the provision that provides criminal penalties for violations of the IGRA, 18 U.S.C. Sec. 1166, "preempted" 18 U.S.C. Sec. 1955. We find this contention to be without merit.
 
 
 32
 The issue in this case is not whether the IGRA and 18 U.S.C. Sec. 1166 preempted 18 U.S.C. Sec. 1955, but whether the former two implicitly repealed the latter. With that in mind, " '[i]t is a familiar doctrine that repeals by implication are not favored. When there are two acts on the same subject the rule is to give effect to both if possible.' " Pipefitters Local 562 v. United States, 407 U.S. 385, 432 n. 43, 92 S.Ct. 2247, 2272, n. 43, 33 L.Ed.2d 11 (1972) (quoting United States v. Tynen, 78 U.S. (11 Wall.) 88, 92, 20 L.Ed. 153 (1871)). Congressional intent to repeal may be demonstrated by the " 'positive repugnancy between the provisions' " of the statute. United States v. Batchelder, 442 U.S. 114, 122, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979) (quoting United States v. Borden Co., 308 U.S. 188, 199, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939)). See United States v. Jackson, 805 F.2d 457, 460 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). Moreover, " '[t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " Traynor v. Turnage, 485 U.S. 535, 548, 108 S.Ct. 1372, 1381, 99 L.Ed.2d 618 (1988) (quoting Morton v. Mancari, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974)).
 
 
 33
 The congressionally declared purpose of the IGRA is to promote tribal economic development and self-sufficiency in addition to shielding the tribes from the influences of organized crime through the enactment of a statutory scheme regulating the operation of gaming by Indian tribes. 25 U.S.C. Sec. 2702(1), (2). To that end, the IGRA divides gaming into three classes, subjecting the classes to varying degrees of regulatory control.
 
 
 34
 Class I gaming, defined as ceremonial or traditional gaming, which includes social games for nominal prizes, remains within the exclusive control of the Indian tribe. 25 U.S.C. Secs. 2703(6), 2710(a)(1). Class II gaming, which includes bingo, lotto, pull-tabs, tip jars, punch boards and card games that are either authorized or not specifically prohibited by state law, remains within the jurisdiction of the tribe but is subject to oversight by the National Indian Gaming Commission ("NIGC"). 25 U.S.C. Secs. 2703(7)(A), 2710(a)(2), (b) and (c). Class II gaming is only permitted (1) if carried on in a state that allows such gaming for any purpose by any person, organization, or entity; (2) if not prohibited by federal law; and (3) if a tribal ordinance or resolution has been adopted permitting such gaming. 25 U.S.C. Sec. 2710(b)(1)(A), (B), (b)(2) and (b)(4)(A). The IGRA expressly excludes from class II gaming slot machines of any kind. 25 U.S.C. Sec. 2703(7)(B)(ii). Class III gaming, defined as all gaming not listed in either Class I or II, is prohibited unless (1) authorized by a tribal ordinance or resolution; (2) located in a state that permits the particular gaming for any purpose by any person, organization or entity; and (3) conducted in accordance with a compact negotiated between the Indian tribe and the state. 25 U.S.C. Secs. 2703(8), 2710(d)(1).
 
 
 35
 The statutory mechanism providing for the enforcement of the IGRA establishes exclusive federal jurisdiction over criminal prosecutions for violations of state laws made applicable to Indian lands, unless criminal jurisdiction has been transferred to the state. 18 U.S.C. Sec. 1166.
 
 
 36
 The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country.
 
 
 37
 18 U.S.C. Sec. 1166(d). Section 1166(b) provides in relevant part:
 
 
 38
 Whoever ... is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed ... within the jurisdiction of the State in which the act ... occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act ... shall be guilty of a like offense and subject to a like punishment.
 
 
 39
 Under the foregoing provisions, gambling activity that violates state licensing, regulatory, or prohibitory law is punishable even though it may not violate federal law. 18 U.S.C. Sec. 1166(a). Similarly, 18 U.S.C. Sec. 1955 prohibits gambling businesses that violate the law of the state in which they are conducted. Id. Sec. 1955(b)(1)(i). Because the two provisions prohibit gambling conducted in violation of state law and because of the comprehensive regulatory structure of the IGRA, appellants assert that 18 U.S.C. Sec. 1955 did not survive the enactment of IGRA.
 
 
 40
 The fact that the two statutes provide criminal penalties for the same activity, however, is not determinative in this case. For a repeal by implication, the provisions of one must be repugnant to the other. This is not the case. While it is true that both provisions punish gambling operations that violate state law, the scope of section 1955 exceeds that of section 1166. Section 1955 prohibits not only gambling businesses in violation of state law but those enterprises that are conducted by more than five persons and that have operated continuously for more than thirty days or that produce revenues of $2,000 on any single day. 18 U.S.C. Sec. 1955(b). That provision targets large-scale illegal gambling enterprises and imposes stringent penalties--a maximum fine of $20,000 and/or imprisonment for not more than five years and forfeiture of all property used in the illegal enterprise. See United States v. Farris, 624 F.2d 890, 896 (9th Cir.1980) (identifies federal interest as eradication of large-scale gaming). It would be illogical to suppose that Congress now intends to punish extensive gambling businesses under state misdemeanor statutes, which are subsumed under section 1166(a), simply because they are conducted in Indian country. See N.Y.Penal Law Secs. 225.05, 225.30 (McKinney 1989) (class A misdemeanors for both promotion of illegal gambling and possession of illegal gambling devices). We conclude therefore that the provisions do not demonstrate the mutual exclusivity necessary to impute to Congress the clear, affirmative intent to repeal.
 
 
 41
 Cook also maintains that 15 U.S.C. Sec. 1175 was repealed by the IGRA. We need go no further than to refer Cook to 25 U.S.C. Sec. 2710(d)(6), which expressly provides for the continuing application of 15 U.S.C. Sec. 1175, except where gaming is conducted in accordance with a tribal-state compact that is in effect. A compact is in effect only when "notice of approval by the Secretary [of the Interior] of such compact has been published by the Secretary in the Federal Register." 25 U.S.C. Sec. 2710(d)(3)(B). Although the St. Regis tribe has entered into negotiations with New York State for the purpose of forming a compact, no compact has been agreed to and there has been no official approval of the compact. Therefore, the operation of slot machines by Cook falls squarely within the prohibited activity governed by section 1175.
 
 
 42
 III. Claim that offenses do not violate New York law
 
 
 43
 Even if 18 U.S.C. Sec. 1955 was not impliedly repealed, Laughing and Burns contend that the government failed to prove an essential element of an offense under section 1955, namely that the operation of slot machines violated New York law. Appellants' argument that this essential element was not proved may succeed only if their gambling activity did not violate "the law of a State ... in which it is conducted." 18 U.S.C. Sec. 1955(b)(1)(i). Their position is that whether state law has been violated depends upon whether New York law is criminal/prohibitory or civil/regulatory. The prohibitory/regulatory distinction was developed to aid in the interpretation of Public Law 280, which granted certain states general criminal and civil (but not regulatory) jurisdiction over specified areas of Indian country.[1] See Bryan v. Itasca County, 426 U.S. 373, 380-81, 96 S.Ct. 2102, 2107, 48 L.Ed.2d 710 (1976). The distinction was created to protect Indian sovereignty from interference by the states, precluding states from asserting civil regulatory powers over the Indian tribes. United States v. Dakota, 796 F.2d 186, 187-88 (6th Cir.1986).
 
 
 44
 Appellants maintain that New York law is civil/regulatory because New York allows some gambling activity and possession of some gambling devices under certain circumstances, see N.Y.Gen.Mun.Law Sec. 185 et seq. (McKinney 1986 & Supp.1990) (local legislatures may license the operation of games of chance by authorized charitable organizations); N.Y.Penal Law Sec. 225.32 (McKinney 1989) (antique slot machines not used for gambling purposes or machines assembled for purposes of being transported to a jurisdiction where such devices are lawfully operated are permitted), and therefore their activities did not violate the "law of a State ... in which [they were] conducted." We are not persuaded by their contention. Although some gambling activity is permitted, New York flatly prohibits the operation of slot machines for gambling purposes. State v. Snyder, 141 Misc.2d 444, 449, 532 N.Y.S.2d 827, 831 (County Ct.1988) ("such conduct ... is not permitted to any extent in this State"); N.Y.Penal Law Sec. 225.30 (McKinney 1989).
 
 IV. Grace Period
 
 45
 Tarbell, Laughing and Burns further argue that even if the IGRA did not repeal section 1955 or section 1175, their activities fall within the one-year grace period provided by the IGRA. Section 2703(7)(D) provides:
 
 
 46
 Notwithstanding any other provision of this paragraph, the term "class II gaming" includes, during the 1-year period beginning on October 17, 1988, any gaming described in subparagraph (B)(ii) that was legally operated on Indian lands on or before May 1, 1988, if the Indian tribe having jurisdiction over the lands on which such gaming was operated requests the State, by no later than the date that is 30 days after October 17, 1988, to negotiate a Tribal-State compact under section 2710(d)(3) of this title.
 
 
 47
 25 U.S.C. Sec. 2703(7)(D) (emphasis supplied). Subparagraph (B)(ii) refers to "electronic or electromechanical facsimiles of any game of chance or slot machines." 25 U.S.C. Sec. 2703(7)(B)(ii). The appellants argue that the statute provides a one-year grace period for the operation of slot machines, if the slot machines were legally operated on or before May 1, 1988 and if the tribe requests the state in which it is located to negotiate a compact no later than November 16, 1988. "Legally operated" means the device is operated in a state that permits such gaming for any purpose by any person or organization and such gaming is not specifically prohibited by federal law. 25 U.S.C. Sec. 2710(b)(1)(A).
 
 
 48
 The legislative history demonstrates, however, that the grace period is intended to govern currently operated games such as video bingo, bingolet, bingo 21 and other similar devices, which became Class III devices upon the enactment of the statute. S.Rep. No. 446, 100th Cong., 2d Sess., reprinted in 1988 U.S.Code Cong. & Admin.News 3071, 3077, 3080. Through the application of the grace period, the tribes operating such games could continue their operation so long as they request the state to enter into negotiations, thereby preventing a shutdown in operations where the games were not prohibited by federal law and were permitted under state law. Appellants' activities, however, violated both federal and state law.
 
 
 49
 The assertion that the grace period applies to slot machines makes little sense when the statutory requirements for legal operation are examined. The operation of slot machines is only lawful if carried on in a state that "permits such gaming for any purpose by any person, organization or entity...." 25 U.S.C. Sec. 2710(b)(1)(A). As has been established, slot machines for gambling purposes generally are prohibited by the laws of New York State. Legally operated also means that the device was not prohibited by federal law. 25 U.S.C. Sec. 2710(b)(1)(A). But the slot machines operated by appellants were illegal under the statute punishing the use or possession of such devices in Indian country, 15 U.S.C. Sec. 1175. To construe the statute as requested by appellants, would undermine the requirement that to conduct gambling of this sort, a compact must be in effect. 25 U.S.C. Sec. 2710(d)(1)(C).
 
 V. Sufficiency of the evidence
 
 50
 Cook was charged with the illegal possession of gambling devices in Indian country. 15 U.S.C. Sec. 1175. Section 1171 defines the term "gambling device" as follows:
 
 
 51
 (1) any so-called "slot machine" or any other machine or mechanical device an essential part of which is a drum or reel with insignia thereon, and (A) which when operated may deliver, as a result of the application of an element of chance, any money or property, or (B) by the operation of which a person may become entitled to receive, as the result of the application of an element of chance, any money or property.
 
 
 52
 15 U.S.C. Sec. 1171(a)(1). Cook contends that the judge erred in denying his motion for acquittal because there was insufficient evidence to show that he operated a "slot machine." In particular, he complains that the slot machine introduced at trial, People's Exhibit 12, was never operated for the jury and thus the jury could not conclude that he was in possession of slot machines. Moreover, because the government failed to establish the presence of the requisite components--drum or reel with insignia, or that the device delivered money or property as a result of the application of an element of chance--and because the statute specifically mentions these component parts, Cook maintains that expert testimony should have been provided at the very least.
 
 
 53
 We reject Cook's contention. In challenging the sufficiency of the evidence, an appellant bears a "very heavy burden." United States v. Torres, 901 F.2d 205, 216 (2d Cir.1990). A conviction must stand if "after viewing the evidence in the light most favorable to the prosecution" this court finds that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis omitted).
 
 
 54
 Expert testimony is only admissible when such testimony is helpful to the trier of fact. Fed.R.Evid. 702. Such testimony is unnecessary where the jury is capable of comprehending the facts and drawing the correct conclusions from them. Salem v. United States Lines Co., 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). Indeed, the judge in his discretion may exclude expert testimony when it is not helpful to the jury. United States v. Schatzle, 901 F.2d 252, 257 (2d Cir.1990).
 
 
 55
 Here, it cannot be said that the layperson would fail to recognize a slot machine without the introduction of expert testimony. The accessibility of major gambling arenas such as Las Vegas, Nevada, and Atlantic City, New Jersey, has brought home the reality of gambling, and in particular, slot machines. The recognition of an ordinary "one arm bandit" is well within the ability of the average person.
 
 
 56
 At trial, three officers testified about the slot machines at the Night Hawk Cafe. One officer recounted that before the police took the slot machines off the premises, Cook opened each with a key and removed money from within the cash boxes. The officer who was responsible for inventorying the contraband, revealed that there were 62 slot machines in all, exhibit 12 being one of the 62 seized by the police. Finally, although the slot machine was not operated for the jury on account of Cook's objection, it remained in the courtroom for the jury to view throughout the trial and went into the deliberation room as an exhibit. We find no error in the trial judge's decision to deny the motion because the evidence was sufficient for a rational trier of fact to conclude that Cook operated slot machines.
 
 
 57
 VI. Reduction for Acceptance of Responsibility
 
 
 58
 Judge McCurn properly denied Laughing a reduction of sentence for acceptance of responsibility. The reduction was not withheld, as Laughing contends, because he entered a conditional plea and continued to challenge federal jurisdiction. Judge McCurn simply determined that Laughing never had indicated his acceptance of responsibility apart from the guilty plea. Indeed, at the sentencing, Laughing said: "I will go to my grave saying I did nothing wrong." This does not manifest the acceptance of factual guilt referred to in United States Sentencing Commission, Guidelines Manual ("U.S.S.G.") Sec. 3E1.1 Application note 2. See United States v. Royer, 895 F.2d 28, 30 (1st Cir.1990) ("acceptance of responsibility necessitates candor and authentic remorse"). Judge McCurn's determination has an adequate foundation and therefore cannot be disturbed. U.S.S.G. Sec. 3E1.1 Application note 5; see also United States v. Irabor, 894 F.2d 554, 557 (2d Cir.1990).
 
 VII. Other claims
 
 59
 We have considered appellants' remaining contentions and find them to be without merit.
 
 CONCLUSION
 
 60
 For the foregoing reasons, the judgments of the district court are affirmed.
 
 LASKER, Senior District Judge, dissenting:
 
 61
 I respectfully dissent.
 
 
 62
 It is my view that the evidence below was insufficient as a matter of law to establish that the St. Regis Mohawk tribe is a "dependent Indian community." In holding that there was "ample evidence" from which the district court properly could conclude that the St. Regis tribe is a dependent community, the majority cites United States v. Sandoval, 231 U.S. 28, 47-48, 34 S.Ct. 1, 6-7, 58 L.Ed. 107 (1913). There are several reasons why I believe Sandoval does not justify the result reached here. First, the Supreme Court's opinion in Sandoval, because it preceded the enactment of 15 U.S.C. Sec. 1175, is of limited value as a guide to the interpretation of the term "dependent Indian community" as that term is used in the statute.
 
 
 63
 Moreover, the definition of "dependent Indian community" offered by the Sandoval court is too vague to be useful. In holding that the judiciary should follow the lead of the executive and legislative branches with regard to whether a community is dependent, the court stated:
 
 
 64
 [B]y an [sic] uniform course of action beginning as early as 1854 and continued up to the present time, the legislative and executive branches of the Government have regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection, like other Indian tribes, and considering their Indian lineage, isolated and communal life, primitive customs and limited civilization, this assertion of guardianship cannot be said to be arbitrary but must be regarded as both authorized and controlling.
 
 
 65
 231 U.S. at 47. Accordingly, Sandoval, as cited by the majority, stands for the proposition that those Indian communities which the legislative and executive branches have treated, in a non-arbitrary way, as dependent communities should be treated by the courts as dependent communities. However, the Sandoval court does not provide guidelines as to what extent of government involvement is necessary to render a community "dependent." The involvement in tribal affairs demonstrated by the federal government in Sandoval is qualitatively different from the relationship between the federal government and the St. Regis tribe as reflected by the record in this case.
 
 
 66
 It also must be noted that the Sandoval court's reference to the "primitive customs and limited civilization" of the Pueblo in the passage quoted above is a sample of the outmoded assumptions about Native American peoples upon which the Sandoval opinion is based--though such assumptions may have been general at the time. The attitudes expressed in Sandoval cannot be regarded as mere dicta, but, as the quotation above demonstrates, are integral to the holding of the case.
 
 
 67
 Nor do the cases which have established and applied the standard for what constitutes a dependent Indian community under 15 U.S.C. Sec. 1175 offer sufficient support for the result reached here. In United States v. Martine, 442 F.2d 1022 (10th Cir.1971), the Court of Appeals merely describes the general nature of the evidence received by the trial court to determine whether the community in question was dependent without any specific reference to what that evidence demonstrated objectively. In State of Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir.1988), the Court of Appeals concluded that the factual record below was insufficient to reach a conclusion regarding dependency. United States v. Azure, 801 F.2d 336 (8th Cir.1986) involved a situation where the federal government actually retained title to the land upon which the tribe in question lived. In United States v. Levesque, 681 F.2d 75 (1st Cir.1982), cert. denied, 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982), the Court of Appeals based its finding of federal dependency on the fact that the tribe received $3 million per year in federal aid and no state aid. In the present case, the tribe itself owns the land upon which it resides and there has been no evidence with regard to how much funding is actually provided.
 
 
 68
 As the majority opinion correctly states, to determine whether a particular Indian tribe is a dependent community, it is necessary to examine (1) the nature of the area; (2) the relationship of the inhabitants in the area to the Indian tribes and the federal government; and (3) the established practice of government agencies toward that area.
 
 
 69
 The evidence in this case established that the area in question is inhabited by a federally recognized tribe of approximately 3,000 St. Regis Mohawk Indians. Dean White, a representative of the Bureau of Indian Affairs (the "BIA") testified that, "We provide service programs to the tribes. We provide funding for contracts to them, for various socio-economic programs that they run.... We provide funding for education programs, housing programs, training programs, Social Services programs and administration of tribal government programs." He also stated that the BIA guarantees loans to the tribe and individual tribe members through banks and that the BIA is involved in planning and funding roads on the reservation.
 
 
 70
 However, this evidence does not by itself establish that the St. Regis tribe is a dependent community. The mere existence of federal programs which benefit a given community does not establish that that community's relationship with the federal government can be characterized as one of dependency. In ordinary English usage, "dependent" means "relying on another for support" or "lacking the necessary means of support and receiving aid from others." See, e.g., Webster's Ninth New Collegiate Dictionary (1985); Webster's Third New International Dictionary Unabridged (1963). In order to determine whether the St. Regis tribe relies on the federal government for support, it would seem to be necessary to ascertain at the very least what percentage of the tribe's expenses federal funding covers and how many and what percentage of tribe members actually participate in or benefit from federal programs.
 
 
 71
 It is particularly important that the evidence with regard to whether the St. Regis tribe is a dependent community be solid given the dramatic difference between the penalties under 15 U.S.C. Sec. 1175 for committing the offenses in question in "Indian country" and the penalties for the same conduct anywhere else in New York state. Although 15 U.S.C. Sec. 1175 is nondiscriminatory on its face because it applies to persons of all races who commit such offenses in Indian country, the statute has the potential to have a racially discriminatory impact because those most likely to be prosecuted for committing offenses in Indian country are Native Americans. Accordingly, I would reverse and remand for further evidence on the issue of whether the St. Regis tribe is a dependent Indian community.
 
 
 72
 I also dissent from the majority's decision to affirm the district court's refusal to grant Laughing, who pled guilty, a reduction in sentence under the Sentencing Guidelines for acceptance of responsibility. Section 3E1.1 of the Sentencing Guidelines states that a defendant is entitled to credit for acceptance of responsibility "[i]f the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." It is true, as the majority points out, that Laughing did state "I will go to my grave saying I did nothing wrong." However, Laughing also stated that
 
 
 73
 I take full responsibility as running the place. I never denied the fact that I am the owner of [the casino]. I believe that what may be against the law in New York State is not necessarily against the law on the reservation. We are a sovereign nation, whether [the Assistant United States Attorney] wants to believe it or not.
 
 
 74
 In light of that statement, I construe the defendant's statement that he did not believe that he had done anything wrong only as disagreeing with the law as he now understood it, but not failing to accept personal responsibility for his criminal conduct. Accordingly, he is entitled to a reduction for acceptance of responsibility and I would reverse and remand so that he might be resentenced.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Public Law 280 is the commonly-used name of Act of Aug. 15, 1953, Pub.L. No. 83-280, 67 Stat. 588 (codified at 18 U.S.C. Sec. 1162) and 67 Stat. 589 (codified at 28 U.S.C. Sec. 1360). The six states are Alaska, California, Minnesota, Nebraska, Oregon and Wisconsin